**LEAGUE OF UNITED LATIN AMERICAN CITIZENS, COUNCIL NO. 4836 and the Black Advisory Council, organizations incorporated under the laws of the State of Texas, all members acting individually and on behalf of all others similarly situated**

**v.**

**MIDLAND INDEPENDENT SCHOOL DISTRICT, Joseph Golding, Ronald Britton, Fred Newman, Parker Humes, Billy Jackson, all in their official capacities as Trustees of the Midland Independent School District of Midland, Texas.**

No. MO–85–CA–001.

United States District Court,
W.D. Texas,
Midland-Odessa Division.

Sept. 10, 1986.

Rolando L. Rios, San Antonio, Tex., for plaintiff.

Charles Tighe, Midland, Tex., for defendant.

## MEMORANDUM OPINION

BUNTON, District Judge.

This Court has been requested by a panel of the Fifth Circuit[1] to determine whether or not *Thornberg, et al. v. Gingles, et al.* has any application to the situation that exists in the attempt by Appellees to have School Trustees in the Midland Independent School District elected in a manner other than at-large. In other words, the Court has been requested to "Gingleize" (pronounced gin-gull-eyes) its previous decision.

At the outset, the Court recalls a song fairly popular in the late 30's or early 40's that went in part as follows:

I've got spurs that jingle, jangle, 'Gingle,'

As I go riding merrily along,

And they say 'Oh ain't you glad you're single,'

And that song's not so very far from wrong.

### I.

### FACTUAL BACKGROUND

### "I'VE GOT SPURS"

The appellees, Mexican American and Black residents of the Midland Independent School District (MISD) instituted this action on January 3, 1985 pursuant to 42 U.S.C. §§ 1971, 1973, 1983 and 1988 to redress the denial, under color of state law, of rights secured to them under the Fourteenth and Fifteenth Amendments to the United States Constitution.

Specifically, the appellees requested this Court to declare that the existing at-large election scheme of the MISD violated their constitutional rights. They alleged that members of the class which they represent have less opportunity than other members of the electorate to participate in the political process and to elect representatives of

---

1. The judgment of the District Court is vacated and remanded to the District Court for reconsideration in the light of *Thornberg v. Gingles, et al.,* —— U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

their choice to the position of School Board Trustee. The appellees' Complaint also sought a permanent injunction prohibiting the holding of any future school board elections under the at-large election scheme and a formation of a board of trustees whose members are elected from seven single-member districts. Finally, the appellees requested the Court to award them attorneys' fees and costs expended in the prosecution of this action.

The appellants initially denied all allegations of the appellees' Complaint and contended that the at-large election scheme of the MISD Board of Trustees was not violative of the United States Constitution and was in the best interest of all residents of the MISD.

By way of compromise, the parties agreed to an Order of this Court, entered on October 10, 1985, whereby the at-large election scheme was eliminated. Exercising their legislative prerogative, the appellants then submitted a proposed "3–4 Plan" whereby four school board trustees would be elected from single-member districts and the remaining three would be elected at-large. The appellees voiced and filed their objections to the appellants' proposed "3–4 Plan," and contended that the "3–4 Plan" plan diluted their voting strength.

## "OUR SPURS JINGLE, JANGLE, GINGLE"

It is noted that the School Board did not on its own initiative offer to any minority the opportunity to elect one of their number to the School Board from a so-called "safe district" until "spurred" to do so by the instant suit. This in spite of the fact that in the years between 1954 and 1984 there had been *only* three minority members elected to the MISD: one Hispanic (who lived on the west side and did not live where most Hispanics did, i.e., the east side) and two Blacks. One Black was elected without any opponent. This also in spite of the fact that in 1984 Hispanic children constituted 25.39% of the school population and Blacks constituted 10.68%.

It is further noted that these statistics reflect a combined minority of 36.07% of the student population of MISD. The Court is further aware that it was stipulated by the parties that MISD was sued by the U.S. Government to desegrate its schools and that at one time MISD maintained segregated schools. Further stipulations were, at one time, schools were segregated and so were theatres, pools, and restaurants. Needless to say, the poll tax inflicted by the State of Texas was enforced in Midland County.

The appellees voiced and filed their objections to the appellants' proposed "3–4 Plan" and contended that the "3–4 Plan" diluted their voting strength.

A trial on the merits was initially held on January 13, 1986 and January 14, 1986.

Then on January 17, 1986, this Court entered its opinion stating "that the appellants' proposed "3–4 Plan" impermissibly diluted the votes of the appellees in violation of the Constitution and the amended version of Section 2 of the "Voting Rights Act." The Court determined that, in its opinion, the appellees' "7–0 Plan" would best insure equal representation and participation of the entire community in the affairs of the MIDLAND INDEPENDENT SCHOOL DISTRICT. The Court then adopted the two minority districts as drawn by the appellees and allowed the appellants to draw the remaining single-member district lines.

On February 28, 1986, this Court reconsidered its original opinion and again rendered judgment in favor of the appellees' "7–0 Plan." On August 22, 1986, the record in this cause was augmented to aid the Court's reconsideration of the case. The Court's Findings of Fact and Conclusions of law are incorporated in this opinion.

## "AS WE GO–O–O–O RIDING"

Before "riding" any further and before "Gingleizing", the appellees contend that the "3–4 Plan" is impermissible because it is contrary to Texas law.

## II.

### STATE LAW ISSUES

The appellees assert that appellants' proposed "3–4 Plan" and "5–2 Plan" are in violation of § 23.024(b) of the Texas Education Code. This statute provides that "[t]he board of trustees of a school district, *on its own motion,* may order that trustees of the district are to be elected from single member districts or that not fewer than 70% of the members ... are to be elected from single member trustee districts." *Id.* (emphasis supplied)

The state statute is not relevant to the proceedings before the Court. In *McDaniel v. Sanchez,* 452 U.S. 130, 152, 101 S.Ct. 2224, 2237, 68 L.Ed.2d 724 (1981), the Supreme Court held that the Voting Rights Act and its preclearance requirements are applicable to a proposed plan without a showing that a legislative body has the authority to enact a plan in issue.

> The fact that particular requirements of state law may not be satisfied before a plan is proposed to a federal court does not alter this essential characteristic. The applicability of § 5 to specific remedial plans is a matter of federal law that federal courts should determine pursuant to a uniform federal rule.

*Id.* at 152–53, 101 S.Ct. at 2237–38.

The Fifth Circuit's decision in *Calderon v. McGee,* 584 F.2d 66 (5th Cir.1978) is in accord with *McDaniel.* Without mention of the effect of state law upon a plan being considered by a federal district court, the Fifth Circuit in *Calderon* stated that the applicable standard of review for court-approved plans was whether the particular plan is constitutional.

Accordingly, the Court concludes that the state statute in issue has no effect upon the instant proceedings. Rather, this Court's sole interest, and standard, in reviewing or formulating an acceptable plan is to insure that such plan comports with the requirements of the United States Constitution and the laws passed by Congress.

### "MERRILY ALONG" [2]

## III.

In determining whether appellants "3–4 Plan" or "5–2 Plan" meets constitutional muster, the Court, as mandated by the Fifth Circuit, must apply the criteria set forth in *Thornburg v. Gingles, et al.,* —— U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25. The *Gingles* case involved a challenge to the North Carolina General Assembly's redistricting plan for the State's Senate and House of Representatives. The appellees in that case, black citizens of North Carolina who were registered to vote, challenged seven districts, one single-member and six multimember districts. Appellees there alleged that the redistricting scheme impaired black citizens' ability to elect representatives of their choice in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, and in violation of § 2 of the Voting Rights Act.

The *Gingles* case is a significant decision in many respects. First, the case sets forth the criteria to be applied in determining whether there is a violation of § 2 of the Voting Rights Act of 1965, as amended June 29, 1982, 42 U.S.C. § 1973. Second, appellees need not prove that a discriminatory intent exists. Third, trial courts are to apply a "results tests" and are to consider the "totality of circumstances."

In making a determination under the "totality of circumstances" aspect as to whether a § 2 violation exists, the Senate Judiciary Committee Majority Report accompanying the bill that amended § 2 elaborates on circumstances that might be probative of a § 2 violation. These factors listed by Justice Brennan are: [3]

---

**2.** No relation to "Merrily, Merrily" in the old song "Row, Row, Row Your Boat." This is not an admiralty case.

**3.** In setting out the seven factors at Footnote 4 the *en banc* decision in *Zimmer v. McKeithan,* 485 F.2d 1297, aff'd sub nom. *East Carroll Par-*

*ish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), decided by the Fifth Circuit was favorably cited by Justice Brennan for refining and developing *White v. Register,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which voting in the elections of the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of the elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, or practice, or procedure, is tenuous.

---

**4.** The MISD does not include all of Midland County. There are 80,685 people in MISD; of

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, reprinted in 1982; U.S.Code Cong. & Admin.News 177, 206–207 (footnotes omitted).

Although *Gingles* set forth a tripartite test to aid courts in determining whether a § 2 violation exists, the Supreme Court stated that factors as listed in the Senate Report are to be accorded appropriate weight. *Id.*, at —— n. 7, 106 S.Ct. at 2763. Thus, the Court will begin its inquiry by examining the situation in light of the relevant seven factors.

### A. The Extent of Any History of Official Discrimination

The appellants contend that past discrimination is of "little relevance" when determining the intent behind the decision in 1985. As previously discussed, the "intent" requirement for establishing dilution has been eliminated by the amended version of § 2.

It is clear to this Court through the stipulations of the parties and an examination of the state statutes attached hereto as Appendix 1, that Midland County, not unlike countless other counties across the nation, has in the past been the victim of oppressive discrimination.

Of the 113,600 persons living in the County of Midland,[4] 79,439 or 69.9% are of voting age. Mexican-Americans are 11.9% of the county's voting age population while Blacks make up 7.8%. Together, Mexican-Americans and Blacks constitute 19.7% of the total voting age population. As of April, 1985 there were 49,658 persons registered to vote in Midland County. Sixty-two point five percent (62.5%) of the county's eligible population is registered to vote. Thirty-eight point one percent (38.1%) of the Mexican-American population is registered to vote compared to 65.8% of the remaining population. Of the 49,658 registered voters in the county, 3,614 or 7.3% are Mexican-Americans. There is an unregistered potential of 5,882 Mexican-Americans in the county.

---

these, 12,238 are Hispanic (15.17%) and 7,002 are Black (8.68%).

It bears repeating that only three persons that were Hispanic or Black were elected to the Midland School Board; the rest were Anglo.

The percentages stated *supra,* coupled with the past record of minority representation on the MISD Board indicates that past discrimination has lingering effects on the election system.

The stipulations and the facts developed during the trial conclusively show that the past discrimination has touched the rights of Hispanics and Blacks to register, to vote, and to otherwise participate in the democratic process.

As just stated, there is clear evidence of present political disadvantage resulting from past discrimination. The Senate Report notes that the Voting Rights Act serves "not only to correct an active history of discrimination, the denying to negroes of the right to register and vote, but also to deal with the accumulation of discrimination." *Id.* at —— n. 9, 106 S.Ct. at 2763.

### B. *Racially Polarized Voting*

In considering the issue of whether racial polarization exists in the voting patterns of the MISD *vel non,* the Court examines elections over the past two decades under a "totality of the circumstances" approach as the District Court did in *Gingles* and such was approved by the Supreme Court and allowed by § 2(b).

Between April, 1964 and April, 1974 ("the first decade"), prior to the implementation of the numbered place system and majority rule requirement which existed between April, 1974 and April, 1984 ("the second decade"), a total of 23 seats on the MISD were up for election. Of the 52 candidates bidding for these contested seats, six were minority candidates. Of these six minority candidates running for a contested seat during the first decade, three were elected to the school board.

During the second decade, with the numbered place system and majority rule requirement in effect, a total of 19 seats on

the MISD Board were up for election. Of the 47 candidates bidding for these contested seats, eight were minority candidates. Of these eight minority candidates running for a contested seat during the second decade, one was elected to the school board.

The mean number of votes cast in races with minority candidates during the first decade totaled 3,919. The mean number of votes cast in races with no minority candidates during this same period totaled 2,663. Likewise, during the second decade (1974–1984), the mean number of votes cast in races with minority candidates totaled 6,807. The mean number of votes cast in races with no minority candidates during this same period totaled 5,315. This pattern suggests that a larger percent of the total population, i.e., all segments of society, is likely to vote in an election wherein a minority is running.

In 1978 the MISD expanded the number of polling places from two to six. Precincts two through five are predominantly Anglo ("the Anglo Precincts"); precincts one and six are predominantly minority ("the Minority precincts").

In April of 1978 an election was held with a Black candidate running against an Anglo candidate for a position on the MISD Board. The Black candidate won approximately 22.48% of the vote from the Anglo precincts and approximately 22.74% of the vote from the minority precincts. Because the Black candidate won approximately the same percentage of votes from both the Anglo and minority precincts, racial polarization likely played no role in the 1978 election. The Plaintiffs, however, contend that the 1978 election was unique in that the Black candidate was not taken seriously by any segment of the society, Anglo or minority, and thus cannot be taken as evidence of no polarization. The elections following 1978 seem to support the Plaintiffs' evidence on this point.

In the April, 1979 election, four candidates were running for a position on the MISD Board. Two of these four candidates were Hispanic and two were Anglo. The Anglo precincts cast 34.90% of their

vote for the Hispanic candidates; the minority precincts cast 61.13% of their vote for the Hispanic candidates.

Likewise, in the April, 1980 election two candidates, a Black and an Anglo, ran for a contested seat on the MISD Board. Thirty-four point ninety percent (34.90%) of the Anglo precincts voted for the Black candidate, whereas 57.96% of the minority precincts voted for the Black candidate. An Anglo and Black were also running against each other for another position in the 1980 race for the MISD Board. From the Anglo precincts 21.69% of the votes were cast for the Black candidate; from the minority precincts 42.52% of the votes were cast for the Black candidate.

Again in the April, 1984 election, a Black and Anglo were running for the same position on the MISD Board. The Black candidate received 59.88% of the votes cast from the minority precincts as opposed to 33.37% from the Anglo precincts.

The following chart depicts the equity of representation of minorities on the MISD Board:

| Year | % of Representation of Minorities on School Board | % of Minority of School District Population | Equity Measure |
|---|---|---|---|
| 1964 | 0% | 21% | −21% |
| 1965 | 0% | 21% | −21% |
| 1966 | 0% | 21% | −21% |
| 1967 | 0% | 21% | −21% |
| 1968 | 0% | 21% | −21% |
| 1969 | 0% | 21% | −21% |
| 1970 | 14% | 21% | − 7% |
| 1971 | 14% | 21% | − 7% |
| 1972 | 14% | 21% | − 7% |
| 1973 | 14% | 21% | − 7% |
| 1974 | 28% | 21% | + 7% |
| 1975 | 14% | 25% | −11% |
| 1976 | 14% | 25% | −11% |
| 1977 | 14% | 25% | −11% |
| 1978 | 14% | 25% | −11% |
| 1979 | 14% | 25% | −11% |
| 1980 | 0% | 25% | −25% |
| 1981 | 0% | 25% | −25% |
| 1982 | 0% | 25% | −25% |
| 1983 | 0% | 25% | −25% |
| 1984 | 0% | 25% | −25% |

From an examination of the voting patterns and what the Court perceives to be the credible evidence in the case, it appears that in each case in which a minority candidate ran for the MISD Board the voting has been polarized along racial lines.

As has been previously stated, the appellants have agreed to an elimination of the at-large scheme of electing trustees to the MISD Board. The appellants have proposed a "3-4 Plan" whereby four candidates would be elected from single-member districts and three at-large, the at-large members to be elected by numbered posts and staggered. The appellants' proposed "3-4 Plan" creates only one minority district (District 2), which is made up of 76.42% of minority group members. The remaining districts as proposed by the appellants are predominantly Anglo.

Should the "3-4 Plan" be placed in effect by this Court, it is obvious that the minority population of the MISD would be able to elect but one representative.

The appellants argue that by conducting at-large elections as part of their proposed "3-4 Plan" as well as the staggering of those positions, thereby allowing the

electorate an annual opportunity to vote, the efficiency and public responsiveness of the MISD Board will be enhanced. The appellants also state, through the testimony of their superintendent that, as the administrative head of the board, the superintendent will have decreased efficiency if required to respond to and manage seven members elected from single-member districts. The Court is unpersuaded by these arguments.

■ While recognizing that no minority group is constitutionally guaranteed a proportional number of representatives, the Court must conclude that by creating a 76% minority district consisting of at least two separate minority groups, the appellants' proposed plan impermissibly dilutes the votes of the appellees. Although there is no anti-single shot provision in the appellants' proposed plan, the requirement that the at-large candidates run for numbered posts may have an adverse impact on the appellees.

## C. Voting Procedures That May Enhance the Opportunity for Discrimination Against the Minority Group

Since it was formed, all trustees have been elected in at-large elections. Surely this is an "unusually large election district." It couldn't be any larger. It was not until September 1973 that the School Board went to the election of trustees by numbered positions. Prior to that, terms were staggered so that trustees ran three one year, and two each the next two years. All trustees whose terms expired could run, or whoever wished could also run, and the three or two with the most votes (no majority was required) were duly elected.

In January 1976, for the first time the School Board went to the requirement that there must be a majority vote for a candidate. It is interesting to note that the person who seconded the motion to adopt the provisions of § 23.11 of the Texas Education Code (which provided among other things for a majority vote) was made by

5. The Trustee's name on the ballot was Roger Robles. His Spanish name would have been

one of the three minority members [5] to serve on the Board, and he was himself defeated at his next election by an Anglo.

Since the adoption of the majority vote requirement not one member of a minority who had Anglo opposition has been elected a trustee.

Under the at-large system, only three minority candidates have been elected to the MISD Board of Trustees since its inception. The paucity of minority candidates which have been elected to the board is a likely result of past purposeful discrimination.

## D. Candidate Slating Process

There was no proof that there ever was a slating process in the election of school trustees, hence there was no proof that any minority group was denied access to that process.

## E. The Effects of Discrimination in Areas of Education, Employment and Health

Midland County is no different from other counties in Texas. Minority members are at the low end of the spectrum. Whether this is the cause or effect of being hindered from participating effectively in the political process is difficult to determine. While the statistics developed in this trial were several years old, there is no doubt that our economic down turn has accentuated the differences. The per capita income as reflected in P.Ex. 17 reflects that Anglos earn almost three times as much as Blacks and more than twice what Hispanics earn. Those below the poverty level comprise 5.9% of the Anglo population, but 26.7% of the Black population and 17.7% of the Hispanic.

The percent of high school graduates reflect that three-fourths of the Anglos graduated, only one-half of the Blacks and three-eighths of the Hispanics.

Rogelio Robles but for obvious reasons he preferred the Anglicized name for ballot purposes.

Housing characteristics and unemployment rates reflect the same thing. Minorities are the deprived even though they have made great strides in the last two decades.

Indeed these statistics bear out exactly what was found in North Carolina. Again quoting *Gingle* as stated by Justice Brennan:

... members of geographically insular racial and ethnic groups frequently share socioeconomic characteristics, such as income level, employment status, amount of education, housing and other living conditions, religion, language, and so forth. See, e.g., Butler 902 (Minority group "members' shared concerns, including political ones, are ... a function of group status, and as such are largely involuntary.... As a group blacks are concerned, for example, with police brutality, sub-standard housing, unemployment, etc., because these problems fall disproportionatly upon the group"); S. Verbia & N. Nie, Participation in America 151–152 (1972) (hereinafter Verba & Nie) ("Socioeconomic status ... is closely related to race. Blacks in American society are likely to be in lower-status jobs than whites, to have less education, and to have lower incomes.") Where such characteristics are shared, race or ethnic group not only denotes color or place of origin, it also functions as a shorthand notation for common social and economic characteristics. Appellants' definition of polarized voting is even more pernicious where shared characteristics are causally related to race or ethnicity. The opportunity to achieve high employment status and income, for example, is often influenced by the presence or absence of racial or ethnic discrimination. A definition of racially polarized voting which holds that black bloc voting does not exist when black voters' choice of certain candidates if most strongly influenced by the fact that the voters have low incomes and menial jobs—when the reason most of those voters have menial jobs and low incomes is attributable to past or present racial discrimination—runs counter to the Senate Report's instructions to conduct a searching and practical evaluation of past and present reality, S.Rep. 30, and interferes with the purpose of the Voting Rights Act to eliminate the negative effects of past discrimination on the electoral opportunities of minorities. *Id.* at ——, ——, 106 S.Ct. at 2772–73, citing Verbia and Nie, *Participation in America*, at 5, 40.

The situation in Midland though involving two groups is no different.

## F. Overt or Subtle Racial Appeals in Political Campaigns

There was no proof that this existed in any school board election.

## G. The Extent to Which Minorities Have Been Elected

Repeating, only three minority candidates have been elected since its formation. Few minority members have dared to try to be elected. Since the adoption of majority vote requirement, *no* minority member has been elected.

In the last hearing there was proof offered that in an at-large election in the *City* of Midland a minority candidate was defeated in his quest for city councilman. In a race for council, a person from a place (a geographic division which included the east side of town), a minority member was elected.

## "ALO–O–NG"

## IV.

## GINGLES FACTORS

■ Although the factors set out by the Senate are relevant, *Gingles* set forth that for a violation of § 2 to be present, there must be a conjunction of three factors. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. Second, the minority group must be able to show that it is politically cohesive. If the minori-

ty group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the Anglo majority votes sufficiently as a bloc to enable it in the absence of special circumstances, such as the minority candidate running unopposed, to defeat the minority's preferred candidate.

Succintly stated, the bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group. *Id.,* at ——, ——, 106 S.Ct. at 2764–65.

The *Gingles* opinion requires courts to apply the tripartite test set forth above; however, the Supreme Court recognized that the factors listed in *Gingles* will not be dispositive in every situation. The Court stated:

> As must be apparent, the degree of racial bloc vote voting that is cognizable as an element of a § 2 vote dilution claim will vary according to a variety of factual circumstances. Consequently, there is no simple doctrinal test for the existence of legally significant racial bloc voting.

*Id.,* at ——, 106 S.Ct. at 2770.

Thus, the principles elucidated in *Gingles* are general principles that are to provide trial courts with guidance. The factors listed are not an ironclad test that must be rigidly met.

The situation in *Gingles* is factually distinguishable from our situation. Whereas, the situation in *Gingles* involved Anglo and Black voters, the cause before this Court involves Anglo, Black, and Hispanic voters. This additional fact complicates application of the *Gingles* tripartite test in that *Gingles* addresses a § 2 violation involving a minority group, and the situation at hand involves two minority groups. Furthermore, although the invidious nature of discrimination carries with it a certain degree of similarity wherever it may occur, the discrimination which occurred in West Texas has characteristics that are unique to this part of the world. Thus, the political reality in West Texas is not the same as the political reality in North Carolina.

Accordingly, as the indigenous political and social reality differs from that found in North Carolina, the Court will apply the *Gingles* factors as best it can, using a "totality of the circumstances" approach. The Court keeps in mind that "the essence of a § 2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by ... voters to elect their preferred representatives." *Id.,* at ——, 106 S.Ct. at 2764. The Court also recognizes that multimember districts and at-large voting schemes are not per se illegal, and that proportional representation is not a constitutional guarantee.

The first factor of the *Gingles* test provides that a minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. Midland's population is broken down ethnically as follows: 74% of the population is Anglo; 15.9% of the population is Hispanic; and 9.6% of the population is Black.

The evidence presented demonstrates that Blacks and Hispanics live predominantly in the eastern and southeastern portions of Midland. The "Racial Breakdown of 1985 City Voting Precincts by Census Tract, 1980 Census" [Plaintiffs' Exhibit 19] demonstrates the actual population breakdown. The geographical area where Blacks and Hispanics in Midland live roughly correlates with the areas encompassed by City Precincts 1, 2, and 3. The Court notes that, of Midland's total Black population, 92.43% of that population lives within one of the three districts mentioned above. With regard to Midland's Hispanic population, 73.7% of that total live within the same aforementioned precincts. Interestingly, only 7.6% of Midland's majority population live in this area.

The actual ethnic breakdown of the population living in Precincts 1, 2, and 3 is as follows: 34% of the population is Black; 44% is Hispanic; and 22% is Anglo.

Accordingly, the evidence shows that the Blacks and Hispanics in Midland constitute a sufficiently large and geographically compact group to constitute a majority in a single-member district.

## "AND THEY SAY"

## V.

Appellants argue and they say that the appellees' proposed "7–0 Plan" by its very structure prevents the possibility of having a Black population sufficiently large and geographically compact enough to constitute a majority in a single-member district. Appellants argue that the population of Blacks in Appellees' proposed District 1 only constitutes 45.81% of the population. Therefore, appellants argue that appellees' case failed prong one of the *Gingles* test. This argument is not convincing. Although the Black population in District 1 totals 45.81%, a closer look at that district reveals that, when combined with the 25.68% Hispanic population, District 1's total minority representation constitutes 71.5% of the District's population. Thus, in actuality, the District is overwhelmingly populated by minorities. For this reason, appellants' argument fails.

As the Court noted earlier, the situation which occurred in North Carolina and the situation in Midland are factually distinguishable. *Gingles* did not involve a situation where two minority groups live in the same area. Thus, *Gingles* says nothing about the possibility of aggregation or coalition by and between two minority groups.

For the purpose of applying prong one of the *Gingles* tripartite test, this Court is of the opinion that the minority populations living within a geographically compact area must necessarily be aggregated. The Court cannot conceive of the Supreme Court's decision leaving room for any other interpretation. If an aggregation of the minority population is sufficiently large enough to constitute a majority in a single-member district, the first prong is satisfied. Should the Plaintiffs fail to prove that the minorities cannot form coalitions, this

would go to the query presented by prong two. Thus, to not allow an aggregation for the satisfaction of prong one would be inherently unjust. Therefore, from the evidence presented, appellees did satisfy prong one of the *Gingles* test.

As appellees' proof reflects that the minority groups living in Midland are sufficiently large and geographically compact to constitute a majority in a single-member district, the Court's inquiry turns to whether the group is politically cohesive.

The Court recognizes that Blacks and Mexican-Americans are racially and culturally distinct. However, it is also clear that the two groups share common experiences in past discriminatory practices. Whereas the two groups may not always have the same political goals, it is clear that the two groups have political goals that are inseparable. As such, coalition formation will often prove to be mutually beneficial to the two groups. The evidence presented bears out this fact. Testimony presented showed that Blacks and Hispanics worked together and formed coalitions when their goals were compatible. Additionally, the bringing of this lawsuit provides evidence that Blacks and Hispanics have common interests that induce the formation of coalitions.

Appellants argue that Blacks and Hispanics are not politically cohesive. The appellants offered into evidence a survey conducted by the University of Texas at Austin. The survey measured the attitudes of Midland residents vis a vis the MIDLAND INDEPENDENT SCHOOL DISTRICT. About certain things, appellants argue that the survey demonstrates that Blacks and Hispanics have mutually exclusive interests, and that the two groups are politically distinct. The Court is unpersuaded by this argument. Although the survey is an impressive accumulation of data, the survey simply is not relevant to the situation before the Court. The survey is useful only for the purpose for which it was designed; to measure attitudes in Midland vis a vis the Midland School Board. The survey is not relevant to how cohesive people will be, nor is it

relevant to predict voting behavior. The survey itself contains a caveat about using the survey for purposes for which it was not intended to be used. Chapter III of the survey sets forth limitations on the interpretation of data found within it. One of the limitations states as follows:

> Attitudes expressed in response to a question may not determine the action that would result in the actual situation; one can say that he favors increased expenditures in education yet vote to defeat the next bond proposal.

This Court does not believe the information in the survey is relevant to the issue before the Court; furthermore, the very terms of the survey itself set limits on how the data should be used. Thus, the Court is unpersuaded by any arguments counsel presented based on information from the survey.

From the evidence presented, the Court is of the opinion that appellees have satisfied the requirements of prong two of the *Gingles* rubric. The Court now turns its attention to the third requirement.

The third prong of the *Gingles* rubric requires that the appellees be able to demonstrate that the Anglo majority votes sufficiently as a bloc to enable it in the absence of special circumstances to defeat the minorities' preferred candidate. As discussed supra, in the portion of this opinion dealing with racially polarized voting, this Court stated that past voting for the MISD Board has been polarized along racial grounds. When this fact is reviewed in light of the fact that only three minority candidates have been elected to the MISD Board since its inception, it is clear to this Court that appellees have satisfied the requirements of prong three.

#### "AND THEY FURTHER SAY"

Appellants argue that appellees have in fact elected their preferred candidate over 70% of the time.

The Court is again unpersuaded by appellants' argument. The evidence presented by appellants does not tell the whole story. Appellants cite results that have occurred since 1978. Of these results, three of the elections should not be counted, as the winning candidate ran unopposed. Furthermore, the results do not consider those candidates who may have considered running, but due to past discrimination may have perceived running for office to be an exercise in futility. The Court must look at more than just the results of a few elections. The Supreme Court recognized this fact in *Gingles*, when Justice Brennan held:

> The concern is necessarily temporal and the analysis historical because the evil to be avoided is the subordination of minority groups in American politics, not the defeat of individuals in particular electoral contests. Also for this reason, in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one of a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting may explain minority electoral success in a polarized contest.

*Id.*, at ——, 106 S.Ct. at 2769.

From the "totality of the circumstances" this Court is of the opinion that racially polarized voting in Midland has served to prevent minorities in Midland from electing the candidate of their choice. This district experiences legally significant bloc voting that prevents fair minority participation; thus, the Court is of the opinion that appellees have satisfied prong three of *Gingles* tripartite test.

#### "AIN'T YOU GLAD YOU'RE SINGLE"

#### VI.

■ Any proposed election scheme which the Court reviews or formulates must comport with what it perceives to be the re-

quirements of the Constitution and laws of the United States. The Court in this case has carefully considered the totality of the circumstances, and has found that racially polarized voting; the legacy of official discrimination in voting matters, education, housing, and employment; and the persistence of that legacy of past purposeful discrimination has acted in concert with the multimember districting scheme to impair the ability of geographically insular and politically cohesive groups of Black and Hispanic voters to participate equally in the political process and to elect candidates of their choice. Thus, the Court finds that the previous at-large election scheme of electing trustees to the MIDLAND INDEPENDENT SCHOOL DISTRICT is in violation of the Constitution.

Appellants have asked the Court to adopt their "3–4 Plan" or "5–2 Plan" in accordance with "legislative prerogative."

The appellees complain that the appellants' proposed dual election system ("5–2 Plan") places the board trustees from the minority districts in a special category and distinct disadvantage because they would be the only two members elected by a single-member district. Appellants counter that the appellees should have no objection to this proposed remedy because the plan acts to insure two "safe" minority districts.

The Court is in agreement with the appellees that, while the Defendants' *sui generis* Proposed "5–2 Plan" allows for minority representation, the nature of the plan places them in a special category which would make it inherently difficult to effectively represent their constituency. The implicit coercion in such a plan is readily apparent to the Court. No one wants to be an illegitimate child at a family reunion or a "south of the tracks' person crashing a party at a "north of the tracks" location. Indeed, it is evident that such a scheme would doubtless "send[ ] a message to [the trustees elected from the two single-member minority districts] that they are outsiders, not full members of the political community, and an accompanying message to the trustees elected at-large from the pre-

dominantly Anglo community] that they are insiders, favored members of the political community." *Wallace v. Jaffree*, 472 U.S. 38, 69, 105 S.Ct. 2479, 2497, 86 L.Ed.2d 29, 52 (1985) (O'Connor, J., concurring), citing *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1982) (O'Connor, J., concurring). Although borrowed from a different constitutional context, the Court finds the analogies to be poignant as well as the analogy in *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601. After a searching practical evaluation of past and present reality, it is clear that the legacy of past discrimination is still at work in the minds and hearts of minorities in Midland. In politics, where the distinction between image and reality is often clouded, image more often than not reigns supreme over reality. To find the appellants "3–4 Plan" or "5–2 Plan" acceptable would serve to send the wrong message to minority voters in Midland. Such a message would serve to perpetuate the legacy of discrimination in this fair city.

There is no doubt that such apportionment plans result in discrimination against the trustees (and ultimately against the constituency) who happen to be elected from the two minority districts. Such resulting discriminatory impact would dilute the appellees' right to vote and participate effectively in the political process.

### "AND THAT SONG AIN'T SO VERY FAR FROM WRONG"

### VII.

"The only limits on judicial deference to state apportionment policy ... [are] the substantive constitutional and statutory standards to which such state plans are subject." *Seastrunk v. Barnes*, 772 F.2d 143, at 151 (citations omitted). While mindful that it is the function of the legislature to make basic political policy, this Court is unable to accept the appellants' proposed apportionment plans due to their resulting discriminatory impact upon the appellees' right to vote and effectively participate in the political process.

After reviewing the plans submitted by appellants, the Court is of the opinion that both proposed plans offered by the appellants, exercising their legislative prerogative, are violative of the amended version of § 2 of the Voting Rights Act of 1965 and, as such, are unacceptable to the Court, and would be unacceptable under the dictates of the *Gingle* case.

The Court is of the opinion that appellees met the requirements of a § 2 voting dilution claim. Furthermore, the Court is of the opinion that the appellants' "3–4 Plan" and "5–2 Plan" do not meet constitutional muster. The Court is of the firm belief that the single-member district plan is in the best interest of all members of the community, and will insure equal and fair participation in the political process.

The Court finds no alternative but to mandate a Court-drawn plan which provides for the election of trustees to the MIDLAND INDEPENDENT SCHOOL DISTRICT by seven single-member districts.

The Court is ever mindful that some people are opposed to judicial activism and indeed current federal judicial appointees are supposedly screened as to one's ideas on this issue. This opinion, however, does not fit in this category. Congress in 1982 mandated that no citizen be "saddled" with any standard, practice or procedure which denies them their constitutional guarantee. It further mandated that our election processes be open to equal participation by *all* citizens and as much opportunity be given to minorities as majorities to elect representatives of their choice.

Our Supreme Court, in construing this Congressional mandate, held among other things that it could not say that a District Court that was made up of local judges that were well acquainted with the political realities of the State, clearly erred in reaching the conclusion that multimember electoral structure caused some minority voters to have less opportunity than Anglo voters to elect representatives of their choice.

This Court holds that any at-large election in MISD violates the provisions of our Constitution and the Voters Right Act.

This Court is attempting to abide by what our elected representatives passed into law, our President signed into law, and our courts have decreed that it *is* the law. The solution herein set out does just this.

The Court apologizes for the delay in entering this Order at this late date. This case has been on file much too long. Minority representation on the Midland School Board has been too long delayed. Each passing day aggravates an already existing bad situation. Another school year has begun. Trustees elected for a three-year term have been held over for at least another half year. The wheels of justice move slowly, but they move. Hopefully, the matter will be resolved shortly but until the Fifth Circuit has an opportunity to pass on the appeal and the appropriate mandate entered, this Court will stay any further elections but with the exception of the date set for election, in the event of affirmance, the elections will be held in accordance with the "7–0 Plan" previously ordered.

While this Memorandum Opinion might be unduly lengthy, it was solely an attempt to abide by the directions of the Appellate Panel. While some references and headnotes might appear to be flippant, no disrespect was meant to either the Appellate Court or parties to this litigation. This is serious business affecting the lives of all who are fortunate enough to either attend, are parents of pupils, are taxpayers of a fine School District or just persons interested in our political process.

Having "ridden" and having "written" far enough, accordingly, the Court finds that the appellees are "prevailing parties" for purposes of 42 U.S.C. § 1973*l* (e) and that an award of attorneys' fees and costs is appropriate.

All Conclusions of Law and Findings of Fact set forth in the Memorandum Opinion and Order filed January 17, 1986 and the Supplemental Memorandum and Order

filed February 28, 1986 are referred to and incorporated herein.

Having so concluded, the Court shall enter a separate Order contemporaneous herewith.

## JUDGMENT

In accordance with the Memorandum Opinion and Order entered contemporaneously herewith, which is hereby incorporated for all purposes, the Court's Judgment is as follows:

IT IS ORDERED, ADJUDGED, and DECREED that the Defendants' Proposed "3–4 Plan" is unacceptable as it is violative of the amended version of Section 2 of the Voting Rights Act of 1965.

IT IS ORDERED, ADJUDGED and DECREED that the Defendants' Proposed "5–2 Plan" is unacceptable as it is violative of the Amended version of Section 2 of the Voting Rights Act of 1965.

IT IS ORDERED, ADJUDGED, and DECREED that the MIDLAND INDEPENDENT SCHOOL DISTRICT ("MISD") immediately implement a seven-member district plan for election of trustees as the Court has drawn, which is attached hereto as Exhibit A and made a part hereof.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that elections for MISD trustees are stayed, pending further action by the Fifth Circuit Court of Appeals.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED, that commencing with the next MISD trustee election, each Trustee of the MISD must reside within the district from which elected. Such members shall be elected as follows:

(A) The MISD shall be divided into seven single-member districts, being Districts 1, 2, 3, 4, 5, 6, and 7 as shown on the map attached hereto as Exhibit A.

The Court points out that it was unavoidable to draw the boundaries as reflected in Exhibit A without splitting at least two voting precincts. The manner in which the boundaries are drawn, however, provide for the least disruptive voting procedure as possible. Attached hereto, and made a part hereof, is Exhibit B, an explanation of why it was necessary to divide two voting precincts. Exhibit B also sets out the boundaries within the two voting precincts that were split so that the residents of those two districts will know whether to vote in the district in which they reside.

Exhibit C, attached hereto and made a part hereof, is a map of the seven single-member districts as they relate to the entire County of Midland, Texas.

Exhibit D, attached hereto and made a part hereof, sets out the seven single-member districts by county voting precinct population. The minority populations for Districts 3, 4, 5, 6, and 7 are not shown because the percentage of minorities residing in those five districts are miniscule and would have no significant effect upon any election insofar as minorities are concerned.

(B) There shall be seven positions on the School Board with:

Position No. 1 being filled by the representative from District 1;

Position No. 2 being filled by the representative from District 2;

Position No. 3 being filled by the representative from District 3;

Position No. 4 being filled by the representative from District 4;

Position No. 5 being filled by the representative from District 5;

Position No. 6 being filled by the representative from District 6; and

Position No. 7 being filled by the representative from District 7.

(C) There shall be a majority vote requirement in each single-member district election.

(E) Qualified voters in each district can vote only for candidates from such district.

The Court shall enter an Order on Attorneys' Fees as soon as practicable.

IT IS SO ORDERED.

EXHIBIT "B"

It was impossible to split the Midland Independent School District into seven separate districts preserving appropriate percentages for blacks and Hispanics and a permissible population count without splitting two voting precincts. The voting precincts are Precincts 212, which hereafter will lie mostly in District 3, but a portion of 212 will lie in District 2.

All those living east of the line hereinafter set out will vote and reside in District 2 and those west of the line will vote and be residents of District 5. The new line is as follows:

Beginning at the intersection of Scharbauer Drive and Marienfeld Street; thence south down Marienfeld Street to its intersection with Parker Street; thence west on Parker Street until it intersects with the boundary of the Fairview Cemetery; thence with the boundary of Fairview Cemetery west to the intersection of Pecos Street with such cemetery; thence south on Pecos Street to its intersection with Cuthbert Avenue.

The other voting precinct which had to be divided is Voting Precinct 105. This precinct will be partly in District 4 and a portion thereof will be in District 3.

Hereafter all those that live east of the line hereinafter set out shall vote and be residents of District 4, and all those living west of the line will vote and be residents of District 3. The line is as follows:

Beginning at the intersection of Midkiff Road and Illinois, thence west to Midland Drive; thence south on Midland Drive to the intersection of Midland Drive and Thomason Drive; thence in a southeasterly direction along Midland Drive to the intersection of Thomason Drive and West Wall; thence north in a northeasterly direction to the intersection of West Wall and Midkiff Avenue; thence south on Midkiff Avenue to the intersection of Midkiff and West Highway 80.

EXHIBIT "D"

SEVEN SINGLE MEMBER DISTRICTS

By County Voting Precinct

| | Total Population | % Deviation from Ideal of 11,491 | Black | Hispanic Origin |
|---|---|---|---|---|
| **DISTRICT 1** | | | | |
| 201 | 2317 | | 18 | 148 |
| 203 | 288 | | - | 1 |
| 205 | 932 | | 177 | 93 |
| 305 | 3146 | | 2183 | 581 |
| 308 | 4903 | | 2524 | 1909 |
| | 11586 | +0.8% | 4902 | 2731 |
| | | | 42.3% | 23.6% |

Total Minority = 7633 = 65.9%

| | | | | |
|---|---|---|---|---|
| **DISTRICT 2** | | | | |
| * 212 p. | 765 | | 29 | 237 |
| 303 | 470 | | 14 | 162 |
| 304 | 4231 | | 266 | 2133 |
| 306 | 5461 | | 1360 | 3538 |
| 309 | 521 | | 27 | 93 |
| | 11448 | -0.4% | 1696 | 6163 |
| | | | 14.8% | 53.8% |

Total Minority = 7855 = 68.6%

DISTRICT 3

| 101 | 1801 | |
| 105 p. | 1574 | |
| 106 | 5063 | |
| 107 | 119 | |
| 301 | 456 | |
| 302 | 2564 | |
| | 11577 | +0.7% |

DISTRICT 4

| 104 | 2858 | |
| 105 p. | 3320 | |
| 307 | 3283 | |
| 308 | 2258 | |
| | 11719 | +2.0% |

DISTRICT 5

| 102 | 1757 | |
| 103 | 4017 | |
| 205 | 1313 | |
| 212 p. | 2283 | |
| 402 | 1497 | |
| | 10867 | -5.4% |

DISTRICT 6

| 401 | 381 | |
| 403 | 5501 | |
| 405 | 3781 | |
| 406 ) | | |
| 407 ) | 1532 | |
| | 11195 | -2.6% |

DISTRICT 7

| 204 | 474 | |
| 206 | 3046 | |
| 207 | 4032 | |
| 210 | 3103 | |
| 211 | 55 | |
| 404 | 777 | |
| 408 | 95 | |
| 409 | 469 | |
| | 12051 | +4.9% |

DISTRICT TOTAL    80,438 divided by 7 = 11,491 (ideal)

* Split Precincts:
        105
        212

APPENDICES

APPENDIX 1

*Past Racially Discriminatory Constitutional and Statutory Provisions*

Past Racially Discriminatory
Constitutional and Statutory
Provisions

1.  Art. 6 § 2, before deletion of the poll tax provision in 1968, read as follows:
*"Persons qualified to vote; poll tax; absentee voting; members of Armed Forces*

Every person subject to none of the foregoing disqualifications who shall have attained the age of twenty-one (21) years and who shall be a citizen of the United States and who shall have resided in this State one (1) year next preceding an election and the last six (6) months within the district or county in which such person offers to vote, shall be deemed a qualified elector; *and provided further, that any voter who is subject to pay a poll tax under the laws of the State of Texas shall have paid said poll tax before offering to vote at any election in this State and hold a receipt showing that said poll tax was paid before the first day of February next preceding such election. Or if said voter shall have lost or misplaced said tax receipt, he or she, as the case may be, shall be entitled to vote upon making affidavit before any officer authorized to administer oaths that such tax receipt has been lost. Such affidavit shall be made in writing and left with the judge of the election. The husband may pay the poll tax of his wife and receive the receipt therefor. In like manner, the wife may pay the poll tax of her husband and receive the receipt therefor.* The Legislature may authorize absentee voting. And this provision of the Constitution shall be self-enacting without the necessity of further legislation. Any member of the Armed Forces of the United States or component branches thereof, or in the military service of the United States, may vote only in the county in which he or she resided at the time of entering such service, so long as he or she is a member of the Armed Forces." (Emphasis added to poll tax provisions deleted on February 1, 1968)

2.  Art. 8, § 1, before deletion of the poll tax provision in 1979, read as follows:
*"Equality and uniformity; tax in proportion to value; poll tax; occupation taxes; income tax; exemption of household furniture*

Taxation shall be equal and uniform. All property in this State, whether owned by natural persons or corporations, other than municipal, shall be taxed in proportion to its value, which shall be ascertained as may be provided by law. *The Legislature may impose a poll tax.* It may also impose occupation taxes, both upon natural persons and upon corporations, other than municipal, doing any business in this State. It may also tax incomes of both natural persons and corporations other than municipal, except that persons engaged in mechanical and natural pursuits shall never be required to pay an occupation tax; Provided, that two hundred and forty dollars worth of household and kitchen furniture, belonging to each family in this state shall be exempt from taxation, and provided further that the occupation tax levied by any county, city or town for any year on persons or corporations pursuing any profession or business, shall not exceed one half of the tax levied by the State for the same period on such profession or business." (Emphasis added to poll tax provision deleted on January 1, 1979).

3.  TEX.CIV.CODE ANN., art. 2959, before replacement in 1951 by TEX.ELEC. CODE ANN. art. 5.09 (which was repealed itself in 1967), read as follows:
*"Liable to poll tax*
A poll tax shall be collected from every person between the ages of twenty-one and sixty years who resided in this State

on the first day of January preceding its levy, Indians not taxed, persons insane, blind, deaf or dumb, and those who have lost a hand or foot, or permanently disabled, excepted. It shall be paid at any time between the first day of October and the first day of February following; and the person when he pays it, shall be entitled to his poll tax receipt, even if his other taxes are unpaid."

4. TEX.ELEC.CODE ANN., art. 5.09, repealed on February 1, 1967, replaced TEX. CIV.CODE ANN., art. 2959, and read as follows:

*"Liability to pay poll tax*

There shall be levied and collected from every person between the ages of twenty-one and sixty years on the first day of January of each year and resident within this state on that date, an annual state poll tax of one dollar and fifty cents, one dollar of which shall be for the benefit of the free schools and fifty cents for general revenue purposes; provided, however, that the fifty-cent portion of the tax for general revenue purposes shall not be levied and collected from persons insane or blind, those who have lost a hand or foot, those permanently disabled, and disabled veterans of foreign wars where such disability is forty per cent or more, or from members of the active militia of this state who are exempt therefrom under the provisions of Articles 5840 and 5841 of the Revised Civil Statutes of Texas, 1925. On poll tax receipts issued to persons exempt from the fifty-cent portion of the tax, the tax collector shall make the notation 'Partial exemption, _____,' stating the ground therefor, and such person shall not be issued or be required to obtain any other evidence of the exemption. The tax shall be paid at any time between the first day of October and the thirty-first day of January following, both dates inclusive, and shall be paid in the county in which the taxpayer resides at the time of payment; and the person, when he pays it, shall be entitled to his poll tax

receipt, even if his other taxes are unpaid."

5. TEX.ELEC.CODE ANN. art. 5.02, before deletion of the poll tax provision in 1967, read as follows:

*"Qualifications and requirements for voting*

Every person subject to none of the foregoing disqualifications who shall have attained the age of twenty-one years, and who shall be a citizen of the United States, and who shall have resided in this State one year next preceding an election, and the last six months in the district or county in which such person offers to vote, shall be deemed a qualified elector, *provided that any voter who is subject to pay poll tax before offering to vote and hold a receipt showing that said poll tax was paid before the first day of February next preceding such election, and any voter who is exempt from paying a poll tax must procure a certificate showing his or her exemption, as required by this Code. If such voter shall have lost or misplaced said tax receipt or certificate of exemption, he or she shall be entitled to vote upon making and leaving with the judge of the election an affidavit that such tax was paid or such certificate was obtained in the manner and during the time allowed by law preceding such election at which he or she offers to vote, and that such receipt or certificate has been lost, misplaced, or left at home.*

The provisions of this Section shall apply to all elections, including general, special, and primary elections; *provided that a city poll tax shall not be required to vote in any election in this State except in city elections."*

(Emphasis added to poll tax provisions deleted on February 1, 1967.)

6. TEX.CIV.CODE ANN. art. 3107, before repeal in 1977, read as follows:

*"White Primary*

In no event shall a negro be eligible to participate in a Democrat party primary

election held in the State of Texas, and should a negro vote in a Democratic primary election, such ballot shall be void and election officials shall not count the same."

7. Texas Constitution, Article 7, Section 7

"§ 7. Separate schools

"Sec. 7. Separate schools shall be provided for the white and colored children, and impartial provision shall be made for both." (deleted from the Texas Constitution in 1954)

8. Texas Penal Code, Article 492

"Art. 492. 483,346,326 Miscegenation

"If any white person and negro shall knowingly intermarry with each other in this State, or having to intermarried in or out of the State shall continue to live together as man and wife within this State, they shall be confined in the penitentiary not less than two nor more than five years." (repealed January 1, 1970)

9. Texas Revised Civil Statutes, Article 46a, Section 8

"Restrictions as to white persons
and negroes

"Sec. 8. No white child can be adopted by a negro person, nor can a negro child be adopted by a white person." (repealed 1973)

10. Texas Penal Code, Article 1659

"SEPARATE COACH LAW

"Art. 1659. [1523] [1010] Separate coaches

"1. Every railway company, street car company and interurban railway company, or any person or the agent of any person, firm, or corporation who operates an interurban, commercial motor vehicle in carrying passengers for hire between any cities, towns, or villages of this State, lessee, manager, or receiver thereof doing business in this State as a common carrier of passengers for hire shall provide separate coaches or compartments for the accommodation of white and negro passengers.

"2. 'Negro' defined. The term negro as used herein includes every person of African descent as defined by the Statutes of this State.

"3. (a) 'Separate Coach' defined. Each compartment of a railroad coach divided by good and substantial wooden partitions with a door therein, shall be deemed a separate coach within the meaning of this law, and each separate coach shall bear in some conspicuous place appropriate words in plain letters indicating the race for which it is set apart.

"(b) Separate compartments for street car, interurban car and commercial motor vehicle defined. Each street car, interurban car or commercial motor vehicle having a board or marker placed in a conspicuous place bearing appropriate words in plain letters indicating the race for which space is set apart, shall be sufficient as a separate compartment within the meaning of this law.

"4. Violating separate coach law. If any passenger upon a train or street car, interurban car or commercial motor vehicle provided with separate coaches or compartments as above provided shall ride in any coach or compartment not designated for his race after having been forbidden to do so by the conductor in charge of the train, he shall be fined not less than Five Dollars ($5) nor more than Twenty-five Dollars ($25).

"5. Duty of Conductor. Conductors of passenger trains, street cars, interurban lines, or commercial motor vehicles provided with separate coaches shall have the authority to refuse any passenger admittance to any coach or compartment in which they are not entitled to ride under the provisions of this law, and the conductor in charge of the train or street car, interurban car or commercial motor vehicle shall have authority, and it shall be his duty, to remove from a coach or street car, or interurban car or commercial motor vehicle any passenger not entitled to ride therein under the provisions of this law, and upon his refusal to do so knowingly he shall be fined not less

than Five Dollars ($5) nor more than Twenty-five Dollars ($25).

"6. Fines to go to School Fund. All fines collected under the provisions of this law shall go to the available common school fund of the county in which conviction is had. Prosecutions under this law may be instituted in any county through or into which said railroad may be run or have an office. As amended Acts 1935, 44th Leg., p. 387, ch. 147, § 1."

(repealed August 28, 1967)

11. Texas Penal Code, Article 1661.1

"Art. 1661.1 Motor buses

"Separation of races in motor buses

"Section 1. Every transportation company, lessee, manager, receiver and owner thereof, operating motor buses in this State as a carrier of passengers for hire shall provide and require that all White passengers boarding their buses for transportation or passage shall take seats in the forward or front end of the bus, filling the bus from the front end, and that all Negro passengers boarding their buses for transportation or passage shall take seats in the back or rear end of the bus, filling the bus from the back or rear end.

" 'Negro' defined

"Sec. 2. The term 'Negro' as used herein includes every person of African descent as defined by the Statutes of the State of Texas, and all persons not included in the definition of 'Negro' shall be termed 'White persons' within the meaning of this Act.

"Authority of bus operator

"Sec. 3. The operators of all passenger motor buses in this State shall have authority to refuse any passenger or person the right to sit or stand in any motor bus unless such passenger or person shall comply with the provisions of this Act, and such operator shall have the right and it shall be his duty to call any peace officer of the State of Texas for the purpose of removing from any bus any passenger who does not comply with the provisions of this Act, and any such peace officer shall have the right and it shall be his duty to remove from said bus, and to arrest any such passenger so violating this Act, the same as if such person were committing a breach of the peace in the presence of such officer.

"Penalty

"Sec. 4. If any passenger upon any bus in this State shall ride or attempt to ride on said bus in a place prohibited under the provisions of this Act, he shall be guilty of a misdemeanor and upon conviction thereof shall be fined not less than Five Dollars ($5) nor more than Twenty-five Dollars ($25).

"Exceptions

"Sec. 5. The provisions of this Act shall not be construed so as to prohibit nurses from riding in the same end of the bus with their employers or when actually in charge of a child or children of such employers, even though of different races, and shall not prohibit officers from riding with prisoners in the same end of the bus, even though of different races.

"Excursions, chartered or special buses

"Sec. 6. The provisions of this Act shall not apply to any chartered bus or special bus run directly as such for the exclusive benefit of either race, but in all such cases said buses shall be plainly marked 'Chartered' or 'Special.' " (repealed August 28, 1967)

12. Texas Revised Civil Statutes, Article 1688

"Art. 1688. Use of library

"Any white person of such county may use the county free library under the rules and regulations prescribed by the commissioners court and may be entitled to all the privileges thereof. Said court shall make proper provision for the negroes of said county to be served

through a separate branch or branches of the county free library, which shall be administered by custodian of the negro race under the supervision of the county librarian. Id." (repealed September 1, 1969)

13. Texas Revised Civil Statutes, Article 2900

"Art. 2900. 2897–8 Separate schools

"All available public school funds of this State shall be appropriated in each county for the education alike of white and colored children, and impartial provisions shall be made for both races. No white children shall attend schools supported for colored children, nor shall colored children attend schools supported for white children. The terms 'colored race' and 'colored children,' as used in this title, include all persons of mixed blood descended from negro ancestry. Acts 1905, p. 263." (repealed September 1, 1969)

14. Texas Revised Civil Statutes, Article 3221

"Art. 3221. 210 Powers and duties of Board of Control

"Rules and regulations

"Section 1. The Board[1] [footnote omitted] shall make all necessary rules and regulations for the government of the Deaf, Dumb and Blind Asylum for Colored Youths and Colored Orphans[2] [footnote omitted] to comport as nearly as may be practicable with the rules and regulations of the asylums for like purposes in this State. Said Board shall prescribe the duties of all subordinate officers or assistants in said asylum; shall appoint and may remove all such officers or assistants, determine their duties and their compensation. The admission of all deaf, dumb and blind applicants to said asylum, their treatment, instruction and continuance therein, all questions relating to their dismissal or removal, or voluntary departure from said asylum, or employment therein, or thereabout, shall be governed by the rules and regulations of the State Asy-

lums for white youths for the deaf, dumb and blind, and the Board of Control shall have authority to make necessary rules and regulations for the admittance, treatment, instruction and discharge of other applicants for admission to said asylum.

"Removal of colored youth to Austin asylum

"Sec. 2. The State Board of Control is hereby authorized to accept and care for, support and maintain, orphan negro children in said asylum, located at Austin, Texas. Said Board shall have authority to move any and all orphan negro children from the Dickson Colored Orphanage located near Gilmer, Texas, to Austin, and place them in said asylum, and care for, support and maintain them, in said institution whenever they deem it advisable to do so; and until such time said Board shall be authorized to use the land and other property at Gilmer, Texas, now occupied and used by said Dickson Colored Orphanage for such purpose, and shall have all powers and authority herein conferred to control the property of said orphanage at such place, and use it for such purposes until such time as suitable provisions shall be made for caring for said orphans at the said Deaf, Dumb and Blind Asylum for Colored Youths and Colored Orphans at Austin, Texas.

"Appropriation for removal

"Sec. 3. The sum of Seventy-five Hundred ($7,500.00) Dollars is hereby appropriated out of the State Treasury to pay the expenses of caring for and transporting said negro children as provided for in this Act, and to care for, maintain and support orphan negro children as herein provided for the fiscal year ending August 31, 1929, the same to be available to the Board of Control for such purposes.

"Additional appropriation

"Sec. 4. The further sum of Thirty Thousand ($30,000.00) Dollars is hereby

appropriated out of the State Treasury for the care, maintenance, support and transportation of said orphans negro children for the year ending August 31, 1930, and also the sum of Thirty Thousand ($30,000.00) Dollars for the year ending August 31, 1931, the same to be available to the Board of Control for such purposes.

"Acceptance of donation by Dickson Colored Orphanage Incorporated

"Sec. 5. The donation by the Dickson Colored Orphanage Incorporated to the State of Texas of the lands and premises, and improvements therein described in the deed conveying said property to W.H. Francis, Trustee, in trust for the State of Texas, for the establishment of an orphanage asylum for colored children; said land consisting of approximately seven hundred acres, all in solid body, situated near the Town of Gilmer in Upshur County, Texas, together with all improvements thereon, said improvements consisting of approximately twenty-nine buildings, is hereby accepted; and said trustee is hereby directed to execute and deliver the proper deed conveying said land and premises unto the State of Texas for the purpose herein specified, free from all debts, liens, or encumbrances of any character whatsoever; the instrument conveying said property shall be drawn by the Attorney General and after its execution, shall be delivered to the State Board of Control of the State of Texas to be by it filed and recorded in the office of the County Clerk of Upshur County, Texas; the said trustee shall also furnish to the Attorney General of the State of Texas an abstract of title to said property showing said property to be free from all debts, liens or encumbrances of any character whatsoever, and it is hereby made the duty of the Attorney General to examine and approve the title to said property.

"The donation by the said Dickson Colored Orphanage Incorporated to the State of Texas of all personal property owned by it and used in connection with or located at said orphanage, and consisting of several carloads of brick; approximately one thousand sacks of cement; approximately nineteen mules, four horses, twenty-five head of fairly good grade jersey cattle, a breeding sow, four pigs, a few chickens, numerous farming implements, household and kitchen furniture, cooking utensils, and food supplies, is hereby accepted and the Board of Control of this State is hereby authorized and directed to accept and receive said personal property, and to use and dispose of the same as in this Act provided.

"Construction of act

"Sec. 6. Nothing in this Act shall be construed as to require the real estate herein to be deeded to the State of Texas before the Board of Control shall have the authority to use the money herein appropriated for the care of said Negro orphans, but to the contrary, this Act shall be construed so as to give the Board of Control authority to accept the property herein mentioned at any time and in any manner so long as they do not bind the State of Texas to pay any indebtedness on said property; and this Act shall also give the Board of Control authority to care for, maintain and support said Negro orphans and to provide quarters and other things incidental to the welfare of said orphans such as the Board of Control may deem advisable.

"Sale of Dickson Colored Orphanage property authorized

"Sec. 7. As soon as all the negro children are removed from said Dickson Colored Orphanage by the Board of Control as provided for in this Act, the said Board shall be authorized, and it is hereby made its duty, to sell the said Dickson Colored Orphanage property for the best price that can be obtained therefor; said sale to be either for cash or on a credit as said Board may determine to be for the best interest of the State. The title to said real property shall be conveyed to the purchaser by deed duly executed by

the members of the Board of Control, and the title to the personal property shall be passed to the purchaser by bill of sale, duly executed by said members. The proceeds from the sale of said property when collected shall be used by the said Board of Control for the purchase of additional land, the erection of additional buildings, or the support and maintenance for the said Deaf, Dumb and Blind Asylum for Colored Youths and Colored Orphans at Austin, Texas, as said Board may determine to be for the best interest of said institution." (repealed August 25, 1967)

15. Texas Revised Civil Statutes, Article 4607

"Art. 4607. [4613] [2959] [2843] Certain intermarriages prohibited

"It shall not be lawful for any person of Caucasian blood or their descendants to intermarry with Africans or the descendants of Africans. If any person shall violate any provision of this article, such marriage shall be null and void. P.D., 4670; P.C. 346." (repealed January 1, 1970)

16. Texas Revised Civil Statutes, Article 5920

"Art. 5920. Bath facilities

"The operator, owner, lessee or superintendent of every coal mine in this State employing ten or more men shall provide a suitable building convenient to the principal entrance of such mine, for the use of persons employed in and about said mine, for the purpose of washing themselves and changing their clothing when entering or leaving the mine. Such building shall be provided with proper light and heat, with a supply of hot and cold water and shower baths, and with properly constructed individual lockers for the use of such employees. The employees shall furnish their own towels, soap and locks for their lockers, and shall exercise control over and be responsible for all property by them left in such house. The baths and lockers for negroes shall be separate from those for whites, but may be in the same building.

No operator, owner, lessee or superintendent or company, its officers or agents, maintaining such a bath house at his or its mine as required herein shall be liable for the loss or destruction of any property left at or in said house. The Commissioner of Labor Statistics of the State of Texas shall enforce the provisions of this article. Acts 1915, p. 100." (repealed September 1, 1969)

17. Texas Revised Civil Statutes, Article 6070e

"Art. 6070e. Separate facilities for white and negro citizens

"Section 1. Separate facilities shall be furnished in the system of State parks for the white and negro races, and impartial provision shall be made for both races.

"Sec. 2. The State Parks Board is authorized:

"(a) To make rules and regulations for the use of the State Parks and the facilities therein by the white and negro races by providing separate parks or separate facilities within the same parks, on such basis as will furnish equal recreational opportunities and at the same time protect and preserve harmony, peace, welfare, health, and safety of the State and the community;

"(b) To close any park or facility or facilities or areas in the State parks where separate equal facilities for the white and Negro races cannot be furnished, and to reopen them when such facilities are available;

"(c) To lease annually to the highest bidder any park or any portion thereof, or facility therein, when deemed necessary or advisable for protection and upkeep of the property. Such lease shall be previously advertised once a week for four weeks in a daily or weekly newspaper in the county in which the park is located. If the county has no such newspaper, such advertisement may be run in a similar newspaper in any adjoining county. The Board is authorized to make additional rules for such leasing. The proceeds derived from such lease are

hereby appropriated to the State Parks Board to be used for the improvement of the State parks system, and to pay for the expenses of advertising the sale or lease. Acts 1950, 51st Leg., 1st C.S., p. 78, ch. 17." (repealed September 1, 1969)

18. Texas Revised Civil Statutes, Article 6417

"Art. 6417. [6746 to 6753] Separate coaches

"1. Every railway company, street car company, and interurban railway company, lessee, manager, or receiver thereof, doing business in this State as a common carrier of passengers for hire, shall provide separate coaches or compartments, as herein provided, for the accommodation of white and negro passengers, which separate coaches or compartments shall be equal in all points of comfort and convenience.

"2. 'Negro' defined—The term 'negro' as used herein, includes every person of African descent as defined by the statutes of this State.

"3. 'Separate coach' defined.—Each compartment of a railroad coach divided by good and substantial wooden partitions with a door therein shall be deemed a separate coach within the meaning of this law, and each separate coach shall bear in some conspicuous place appropriate words in plain letters indicating the race for which it is set apart; and each compartment of a street car or interurban car divided by a board or marker placed in a conspicuous place, bearing appropriate words in plain letters indicating the race for which it is set apart, shall be sufficient as a separate compartment within the meaning of this law.

"4. Penalty.—Any railway company, street car company, or interurban railroad company, lessee, manager or receiver thereof, which shall fail to provide its cars bearing passengers with separate coaches or compartments, as above provided for, shall be liable for each failure to a penalty of not less than one hundred nor more than one thousand dollars, to be recovered by suit in the name of the

State; and each trip run with such train or street car or interurban car without such separate coach or compartment shall be deemed a separate offense.

"Railroads

"5. Exceptions.—This article shall not apply to any excursion train or street car or interurban car as such for the benefit of either race, nor to such freight trains as carry passengers in cabooses, nor be so construed as to prevent railroad companies from hauling sleeping cars, dining or cafe cars or chair cars attached to their trains to be used exclusively by either race, separately but not jointly, or to prevent nurses from traveling in any coach or compartment with their employer, or employes upon the train or cars in the discharge of their duty.

"6. Law to be posted—Every railroad company carrying passengers in this State shall keep this law posted in a conspicuous place in each passenger depot and each passenger coach provided in this law.

"7. Duty of conductor.—Conductors of passenger trains, street cars, or interurban lines provided with separate coaches shall have the authority to refuse any passenger admittance to any coach or compartment in which they are not entitled to ride under the provisions of this law, and the conductor in charge of the train or street car or interurban car shall have authority, and it shall be his duty, to remove from a coach or street car, or interurban car, any passenger not entitled to ride therein under the provisions of this law. [Acts 189], p. 44; Acts 1907, p. 58; G.L. vol. 10, p. 46.]" (repealed September 1, 1969)

19. Texas Revised Civil Statutes, Article 6498

"Art. 6498. [6693] Suitable depots

"Each railroad company in this State shall provide and maintain adequate, comfortable and clean depots and depot buildings at their several stations for the accommodation of passengers, and keep said depot buildings well lighted and

warmed for the comfort and accommodation of the traveling public. They shall keep and maintain separate apartments in such depot buildings for the use of white passengers, and keep and maintain adequate and suitable freight depots and buildings for receiving, handling, storing and delivering of all freight handled by such roads, and the Commission shall require railroad companies to comply fully with the provisions of this law under such regulations as said Commission may deem reasonable. [Acts 1909, 2nd C.S., p. 401.]"

(repealed September 1, 1969)

## APPENDIX 3

*The Plaintiffs' Proposed "7–0 Plan"*