John S. NEAL, et al., Plaintiffs,

v.

J. Douglas COLEBURN, et al., Defendants.

Civ. A. No. 87–0573–R.

United States District Court,
E.D. Virginia,
Richmond Division.

June 27, 1988.

Susan L. Quig–Terry, ACLU of Virginia Foundation, Gerald T. Zerkin, Zerkin and Associates, Richmond, Va., for plaintiffs.

Mayo K. Gravatt, Gravatt & Gravatt, Blackstone, Va., for defendants.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This case presents a voting rights challenge to the current method for electing the board of supervisors of Nottoway County, Virginia. The plaintiffs contend that the district lines drawn for the board's single-member districts impermissibly dilute the voting power of the County's black voters, in violation of the United States Constitution and § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.

For the reasons set forth below, the Court concludes that the County's electoral districting scheme dilutes the voting strength of the County's black voters in violation of § 2 of the Voting Rights Act of 1965, and that the scheme is therefore invalid. Accordingly, the Court today orders into effect a new districting plan for the election of supervisors in Nottoway County, and orders that a special election for supervisors be held on November 8, 1988.

### I. FACTUAL BACKGROUND

This case was tried to the Court without a jury on March 28, 1988. This Opinion sets forth the Court's decision, including its findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P.

The plaintiffs John S. Neal, Darius Irby, Carroll M. King, James H. Jennings, Jr., and Patricia A. Crawley are adult black citizens of Nottoway County, Virginia. All of the plaintiffs are registered voters.

The defendants are officials of Nottoway County. Defendants J. Douglas Coleburn, Robert Ray Taylor, Dick R. Forrester, Jr.,

Sidney E. Locke and Hugh O. Robertson were the members of the County's board of supervisors at the time this action was filed. As a result of the November 1987 elections, Forrester and Robertson were replaced by supervisors Elgin L. Myers and Jack J. Green.

Defendants Eloise H. Powell, James R. King, Jr., and G. Forest Ragland are members of the electoral board of the County, and defendant Wanda S. Engle is the Registrar of the County.

The defendants are being sued in their official capacities for declaratory and injunctive relief, for the alleged violations of the Constitution and Voting Rights Act.

### The Current Election Districts

Nottoway County is a predominantly rural county located in Southside Virginia. The County contains the three small towns of Blackstone, Crewe and Burkeville. According to the 1980 Census, the total population of the County was 14,666, of which 5,725 persons are black. Blacks thus account for 39.04 percent of the County's total population, while whites, who number 8,900, account for 60.69 percent. The remaining 41 persons fall into other racial categories.

The County is currently governed by a five-member board of supervisors. Each supervisor is elected by a plurality vote for a four-year term from a single-member district. The terms are not staggered. Despite the fact that the County's population is nearly 40 percent black, the districts have been drawn so that not one of the five districts contains a black majority. In fact, while several districts have large black populations, none is more than 45 percent black. Based on the 1980 Census data, the population of the current districts is as follows:

|  | TOTAL | BLACK | PERCENT |
| --- | --- | --- | --- |
| District 1 | 2,885 | 1,301 | 45.1 % |
| District 2 | 2,910 | 623 | 21.4 |
| District 3 | 2,840 | 1,223 | 43.06 |
| District 4 | 2,987 | 1,336 | 44.73 |
| District 5 | 3,044 | 1,242 | 40.8 |

*See* Defendants' Interrogatory Answer 17; Defts' Exh. 3.

*History of Discrimination*

The Commonwealth of Virginia and its political subdivisions bear a history of official racial discrimination against black persons, as is evidenced by the discriminatory voting practices and other laws set forth in Plaintiffs' Second Request for Judicial Notice and in Plaintiffs' Exhibits 3A—3W.

This history of public racial discrimination includes the following. Until 1974, the Virginia Constitution required proof of literacy for persons registering to vote, in violation of § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. *See Commonwealth of Virginia v. United States*, 386 F.Supp. 1319 (D.D.C.1974) (three-judge court), *aff'd* 420 U.S. 901, 95 S.Ct. 820, 42 L.Ed.2d 833 (1975).

Prior to 1966, Virginia unconstitutionally maintained a poll tax which was specifically recognized as intended to discriminate against black voters. *See Harper v. Virginia State Board*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965).

Until 1964, Virginia laws unconstitutionally required the separation of names by race on voter registration, poll tax, residence-certificate, and property ownership and tax lists. *Griffin v. Board of Supervisors of Prince Edward County*, 339 F.2d 486 (4th Cir.1964); *Hamm v. Virginia State Board*, 230 F.Supp. 156 (E.D.Va. 1964) (three-judge court), *aff'd sub nom. Tancil v. Woolls*, 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91 (1964).

Until 1963, Virginia statutes required racial segregation in places of public assemblage. *See Brown v. City of Richmond*, 204 Va. 471, 132 S.E.2d 495 (1963); *Blackwell v. Harrison*, 221 F.Supp. 651 (E.D.Va. 1963). Furthermore, interracial marriage was prohibited by law in Virginia until 1967. *See Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Other examples of discriminatory laws and voting practices are detailed in the plaintiff's Second Request for Judicial Notice.

The Court finds that as a result of their subjection to racial discrimination, blacks in Nottoway County have historically not fully participated in the political process, including the election of public officials. Indeed, blacks in Virginia are registered to vote in lower percentages than are whites. According to the 1980 Census, only 60.7% of blacks were registered to vote in 1976, while for white voters this figure was 67%. *See* U.S. Comm'n on Civil Rights, *The Voting Rights Act: Unfulfilled Goals* 19, table 2.10 (Sept. 1981) (contained in Pltfs' Exh. SS, in Second Request for Judicial Notice).

*Socio-economic Conditions*

The Court further finds that blacks in Nottoway County continue to suffer from the socio-economic consequences of that past discrimination. As established by the 1980 Census data (see Pltfs' First Request for Judicial Notice and Defts' Exh. 20), these effects are evident in all facets of everyday life. They include depressed economic, educational and employment levels and inferior residential circumstances. In general, blacks have less education than do whites of the same age, have higher rates of unemployment, lower per capita income and lower quality housing than do whites. To the County's credit, it has actively sought industries that would increase levels of employment and income for blacks, and it has made significant improvements in low income housing. Defts' Exhs. 18 and 19.

Dr. Gordon Henderson, an expert for the plaintiffs, testified in his deposition that according to principles of political science, these depressed socio-economic conditions are likely to result (and have resulted) in lower voter registration and voter turnout on the part of blacks. Henderson Depos. at 13–15. The Court finds that the lingering effects of discrimination have adversely affected the ability of black residents of Nottoway County to participate in and to influence the County's political process.

Specifically, the 1980 Census indicates that blacks in Nottoway County are living under the following socio-economic disadvantages. Nottoway County blacks aged 25 and older have much less education than do whites of the same age. According to the 1980 Census, of persons 25 years and older, 47 percent of the whites were high

school graduates, while less than one-fourth (24.5%) of blacks had graduated from high school. The median number of school years completed for persons 25 and over underscores this black-white disparity: for whites, the median education level was 11.7 years, while for blacks it was only 8.2 years. Furthermore, blacks over the age of 32 have attended inferior and segregated schools in the County throughout their education. Even blacks younger than this have attended such schools for varying portions of their education.

With regard to employment, in 1980 the percentage of whites in the labor force who were unemployed was 4.1 percent, while 9.9 percent of the black work force was unemployed. In addition, during 1979, 24.2 percent of the blacks in the work force were unemployed at the same time, while for whites this figure was only 11.5 percent. And the evidence indicates that there are no blacks currently working in the traditional professions within the County, such as doctors, lawyers, accountants or architects. J. Douglas Coleburn Depos. at 45–46.

With regard to the economic status of blacks and whites in Nottoway County, the per capita income of the County's black community reflects its occupational and educational disadvantages. Thus, per capita income as revealed in the 1980 Census was only $3,690 for blacks, as compared to $6,641 for whites. The median income for white families was $18,115, while for black families the median income was only $11,945. The mean income for white families was $20,765, while for black families this figure was $12,786.

The 1980 Census figures also indicate that 28.4 percent of all blacks in the County were living below the poverty level. This is more than twice the percentage of whites (11.3%) who subsist below the poverty line. In addition, 24.5 percent of all black families were below the poverty level, while only 7.1% of white families fell below this line. Nearly 18 percent of black families received public assistance, while only 4.4 percent of white families did so.

The residential conditions for blacks in the County reflect their lower economic status. Several indicators of the quality of housing point out the black-white disparity: the percentage of housing units lacking bathroom facilities; housing units lacking plumbing for exclusive use; and the percentage of persons living in housing with more than one person per room (an indicator of crowding). While 22.3 percent of black housing units do not have bathrooms, this figure was only 3.0 percent for white housing units. Of white occupied housing units, some 3.4 percent lack complete plumbing for exclusive use, while 20.7 percent of black occupied housing units fell into this category. And blacks generally live under more crowded conditions, with 10.8 percent of blacks living in housing with more than one person per room, versus only 1.9 percent for white households.

*Segregation in Social Life*

The Court finds that Nottoway County's black residents continue to suffer from discrimination in the current patterns of thought and day-to-day conduct, which are often a product of the past years of institutional discrimination. Segregation still pervades Nottoway County in many social institutions, including churches, clubs and other civic organizations. Evidence did show that the County's youth organizations (such as scouting groups and little league sports) are generally integrated. Nonetheless, at most levels of social life, blacks and whites remain segregated.

In depositions, for example, the defendants admitted that they attended all-white churches and were members of all-white clubs. Defendants also testified that they had attended segregated schools and that some now send their children to private schools that are predominantly white. Of course, this form of private segregation does not necessarily reflect an invidious or conscious racism. It is, however, indicative of the societal atmosphere in Nottoway County and the type of pervasive mentality that continues to undermine the influence and power of blacks within their community.

Further, the plaintiffs' exhibits evince a history of official and massive resistance to desegregation in Nottoway County, one

that has continuing effects on the current conditions of black social and political life. *See* Pltfs' Exhs. 3A–3W; Second Request for Judicial Notice.

### Political Participation

The evidence further indicates that whites in the County have historically had little personal knowledge of or social contact with blacks. This societal separation continues into the present, and such continuing segregation and relative insulation of the white community only hinders the ability of blacks to participate in Nottoway County politics, thus impeding the ability of black candidates to win the votes of whites. The evidence tends to indicate that black candidates for public office in Nottoway County have been unable to garner significant white support; indeed, at the County level, white cross-over voting for blacks appears to be minimal and insubstantial. The evidence also indicates that white voters will generally vote along racial lines, as a bloc, and thus will not support black candidates. This is especially true in the rural and eastern portions of the County. Such racial bloc voting is discussed in more detail, *infra.*

There was evidence indicating that in the Burkeville town council elections some cross-over voting occurred with blacks winning some white support. Rudolph Harmon, a black member of Burkeville's town council, testified that he believed he had gained the support of a number of white voters in recent elections. However, the record showed that Mr. Harmon's success was rather unique among black candidates for town council, and that at least two other blacks had lost at-large elections in which Harmon won a seat on the council. The record also showed that Harmon was not associated with the leading black civic and political organizations within the County. Tr. 61–72. Finally, his success came in the Burkeville area, where racial relations are better and cross-over voting more likely than elsewhere in the County.

The Court finds that the political processes in Nottoway County have been largely under white control and associated with white political dominance. Polling places have traditionally been located in white areas and the majority of the polling officials are white. As a result of past official discrimination and continuing segregation, blacks have felt and still feel intimidated by the white domination of local politics. Many blacks are generally reluctant to enter the Nottoway courthouse to vote or to attend meetings of the Board, because they view it as the center of white political power. Henderson Depos. at 15. In the words of Jack J. Green, a black supervisor first elected from District 3 in November 1987, "a lot of blacks don't like going to the courthouse to vote," because "it is still carrying the old southern practice, but psychologically now." And Green agreed that blacks still perceive the courthouse as "the old center of white power." Green Depos. at 27–28.

Further, of the 333 persons directly employed by the County itself, only 108 employees are black. Of these, 95 are employed by the County's schools; some 15 are custodians, 17 are bus drivers and 14 are employed under federally funded programs. Of the 13 blacks employed by other county departments, three are part-time employees, three are custodians, one is a truck driver and another is the animal control officer. In all departments of the County, blacks have generally not been hired for the upper level, higher paying jobs. For example, in five of the County's eight departments, blacks have never been hired for senior positions, and four of the County's departments have never hired a black employee. Defts' Interrogatory Answers 10–14.

Politics in a rural community such as Nottoway County are to a large extent not based strictly upon issues and party affiliation, but rather upon personal relationships and popularity. Because blacks and whites generally do not interact with each other either on a social or political level, blacks are disadvantaged by the personal nature of such politicking. Quite simply, whites do not know blacks and are, as a result, highly unlikely to vote for black candidates. Green Depos. at 10–11; Coleburn Depos. at 42–46; Henderson Depos. at 16–17.

Other evidence also indicated that blacks have generally been excluded from the political process. In the years 1986–87, the board of supervisors had two occasions to appoint a person to fill a vacancy on that board. On both occasions, the board appointed a white to fill the vacant supervisor's seat. Both vacancies were in District 3, where in the 1983 elections Jack J. Green had lost by only 30 votes (435 to 405). Pltfs' Exh. 4E. Mr. Green's name was offered for the vacancies, but board members favored other persons. One member of the board testified that he opposed the appointment of Green because he did not think Green would get along with other members, because Green had been "abrasive" in his pursuit of other issues, and because Green would bring a different perspective to the Board. Dick Forrester Jr. Depos. at 36–38. Others testified that the board wanted a farmer to represent the largely agricultural district, and that the board felt that none of the active candidates should be given the edge of incumbency. Coleburn Depos. at 28–38. Whatever the reason for not appointing Green, these incidents do further support the finding that blacks have been excluded from political opportunities within the County.

In summary, the Court finds that blacks as a group in Nottoway County do not have the opportunity to participate fully and equally in the political process. The lower socio-economic and educational level of blacks, and continuing segregation in the County, have impeded their participation in local politics. Again, on a basic level, blacks are registered to vote in lower percentages than are whites—60.7% versus 67% in 1976. And the past official discrimination within the County continues to inhibit political participation by black citizens.

*Racial Bloc Voting.*

Furthermore, the evidence in this case indicates that voting in Nottoway County is to a substantial degree racially polarized; that is, whites generally have not supported or voted for black candidates, nor will they. Instead, white voters' choices are usually correlated with white candidates, and voting thus falls along racial lines. According to the Supreme Court in its recent decision under § 2 of the Voting Rights Act, racially polarized voting "exists where there is 'a consistent relationship between the race of the voter and the way in which the voter votes,' or to put it differently, where 'black voters and white voters vote differently.'" *Thornburg v. Gingles*, 478 U.S. 30, 53 n. 21, 106 S.Ct. 2752, 2768 n. 21 92 L.Ed.2d 25, 48 n. 21 (1986). Under this definition, the Court finds that racially polarized or racial bloc voting is present in Nottoway County elections. Several examples in the record bear this out.

Jack Green was first elected to the County's board of supervisors in November of 1987. Mr. Green, a black candidate, had previously run for the District 3 seat against two white candidates in 1983, when he lost by only 30 votes. The winner in that race received 435 votes, Green received 405 votes and the third candidate took 175 votes. Pltfs' Exh. 4E. Green's successful election to the board in 1987 was consistent with racially polarized voting. In that year he ran against two strong white candidates, with the following results: Green, 441 votes (39.5%); Everett Pennington, 374 votes (33.5%); and Wallace Boyd, 301 votes (27%). Pltfs' Exh. 4A. Thus, while Green received nearly 40% of all votes cast, the two white candidates together received 60.5% of the vote. These figures are telling when compared to the fact that the district's population is 43% black and 57% white.

Of course, these figures alone are not conclusive on the question of racial bloc voting, but such voting would help explain why Green lost the 1983 election and yet won in 1987: in short, the two white candidates were strong enough to split most of the white vote, thus allowing Green to win with a plurality of only 39.5%. And in his deposition, Jack Green testified that he believed the voting in his district and the County at large was racially polarized. Green Depos. at 23–24.

In addition, there was evidence indicating that the 1983 supervisors election was attended by subtle racial appeals. For example, an editorial in the Blackstone newspaper, in discussing the upcoming election,

identified Mr. Green and Mr. Macio Hill as black candidates and urged voters not to vote on account of race, but rather on merit. However, the editorial also said that the race from District 3, involving Jack Green, "is of great concern to many county residents" because Green could earn "solid black support" to defeat the veteran incumbent. The editorial clearly favored the re-election of the "more experienced" incumbents. *See* Pltfs' Exh. 3V ("The Outcome of the Election is Up to You," *Blackstone Courier-Record* at 5, cols. 1–4 (Oct. 13, 1983)).

A second case involves Mr. Wadsworth Hawkes, the first black ever to serve on the Blackstone town council. Initially, Hawkes had been appointed to a vacancy on the council. He later ran in the at-large general election held in May of 1986 (which took place during the pendency of a federal voting rights suit against the town). Hawkes received 386 votes, the most votes received by any candidate then running. Pltfs' Exh. 4C. Yet in the special election held less than one year later in March of 1987, Hawkes was decisively defeated in his bid for an at-large seat, losing to two white candidates whom he had beaten in the 1986 election. Pltfs' Exh. 4B. According to J. Douglas Coleburn, a supervisor and the local newspaper editor, Hawkes was defeated because whites had voted as a bloc against him. White voters generally perceived that blacks had attained electoral majorities in three of the town's five wards, and they were thus unwilling to vote for another black candidate. Coleburn Depos. at 48–50. These facts, taken in the context of the voting rights suit that was pending against the town, are consistent with and indicative of racially polarized voting in the County.

Finally, the results of the 1985 state-wide elections also support a finding that Nottoway County's voting is racially correlated. The County's voting patterns in this election were most interesting. On the successful Democratic Party ticket were Gerald Baliles for governor, L. Douglas Wilder for lieutenant governor, and Mary Sue Terry for attorney general. Baliles won the governor's race, with 2269 County votes to his opponent's 1993; Terry also won the

County, taking 2355 votes to her opponent's 1855. However, unlike his fellow Democrats, Wilder (who is black) lost in the County's voting by almost a reverse margin, taking 1958 votes to his opponent's 2262. Pltfs' Exh. 4D. Once again, the facts indicate a likelihood of racial bloc voting on the part of many Nottoway County whites. Such a racial correlation at least provides a consistent and persuasive explanation for the substantially fewer votes received by Wilder.

In summary, all of these facts suggest that voting in the Nottoway County elections is racially polarized to a substantial degree. In fact, based on this evidence, Dr. Gordon Henderson, the plaintiff's expert on political voting behavior, concluded that the data were "all consistent with" the existence of racial bloc voting. Henderson Depos. at 17–18. The Court agrees.

## II. DISCUSSION

Plaintiffs in this case have advanced essentially two vote dilution claims, one based on the Constitution of the United States, and the other based on § 2 of the Voting Rights Act of 1965, as amended. This Court has jurisdiction under 28 U.S.C. §§ 1331(a), 1343(a)(3)—(4), and 2201.

Plaintiffs base their constitutional claims on the First, Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States. The law is clear that a purposeful intent to discriminate or discriminatory motivation must be shown to recover on claims under the Fourteenth and Fifteenth Amendments. *Rogers v. Lodge*, 458 U.S. 613, 616–18, 102 S.Ct. 3272, 3275–76, 73 L.Ed.2d 1012 (1982); *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *see also Irby v. Fitzhugh*, 692 F.Supp. 610, 617 (E.D.Va.1988) (Williams, J.). Because the Court finds that the dilutive effect of the current districting scheme violates § 2 of the Voting Rights Act, it does not reach the further question whether a discriminatory intent motivated the design or adoption of the current district plan. *See Gingles v. Edmisten*, 590 F.Supp. 345, 353 (E.D.N.C.

1984) (three-judge court), *aff'd in part, rev'd in part sub nom. Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

Instead, the Court focuses on the elements of a § 2 claim. As the Supreme Court has stated, "[t]he essence of a § 2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* at 47, 106 S.Ct. at 2764–65, 92 L.Ed.2d at 44. Before stating its conclusions, the Court will first review the law governing a vote dilution claim asserted under § 2 of the Voting Rights Act.

### A. *The Voting Rights Act, § 2*

In 1982, Congress amended § 2 largely as a response to the Supreme Court's plurality opinion in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which had declared that, in order to prove a violation of either § 2 or the Fourteenth and Fifteenth Amendments, plaintiffs must show that a challenged electoral scheme was intentionally adopted or maintained by state officials for a discriminatory purpose. Congress substantially revised § 2 to make clear that a violation could be proven by showing a discriminatory effect alone, and to establish as the relevant legal standard the "results test" applied by the Supreme Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and by other federal courts prior to *Bolden. See Thornburg v. Gingles,* 478 U.S. at 35, 106 S.Ct. at 2759, 92 L.Ed.2d at 37; S.Rep. No. 417, 97th Cong., 2d Sess. 27–28, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 204–05.

As amended, Section 2 now reads as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered; *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

The Report of the Senate Judiciary Committee accompanying the bill that amended § 2, elaborates on the circumstances that might be probative of a § 2 violation, noting the following as "typical factors:"

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, em-

ployment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S.Code Cong. & Admin.News 206–07 (footnotes omitted). These factors were derived from the Supreme Court's decision in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), as refined and developed by the Fifth Circuit in *Zimmer v. McKeithen,* 485 F.2d 1297 (1973), *aff'd sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). *See* S.Rep. at 28, n. 113; *Gingles,* 478 U.S. at 36–37, 106 S.Ct. at 2759–60, 92 L.Ed.2d at 38.

As the *Gingles* Court noted, the Senate Report "dispositively rejects the position of the plurality in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters." Instead, as the Senate Report emphasized, the "right" question is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Thornburg v. Gingles,* 478 U.S. at 43–44, 106 S.Ct. at 2763, 92 L.Ed.2d at 42–43; S.Rep. at 15–16, 27–28.

This question must be answered on the basis of the objective factors outlined above. The *Gingles* opinion went on to say that:

this list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. S.Rep. 29–30. Furthermore, the Senate Committee observed that 'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.' *Id.,* at 29. Rather, the Committee determined that "the question whether the political processes are equally open depends upon a searching practical evaluation of the 'past and present reality,'" *id.,* at 30 (footnote omitted), and on a "functional" view of the political process. *Id.,* at 30, n. 120.

*Thornburg v. Gingles,* at 45, 106 S.Ct. at 2764, 92 L.Ed.2d at 43; *see also Dillard v. Crenshaw County,* 649 F.Supp. 289, 294 (M.D.Ala.1986), *aff'd* 831 F.2d 246 (11th Cir.1987). In summary, the Senate Report "espouses a flexible, fact-intensive test for § 2 violations." The plaintiffs "must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." *Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764, 92 L.Ed.2d at 43–44.

Finally, the Supreme Court in *Gingles* set forth three essential elements for any claim of vote dilution under § 2 of the Voting Rights Act. In order to make out a § 2 violation, the plaintiffs must prove: (1) that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) that the minority group "is politically cohesive;" and (3) that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—*usually* to defeat the minority's preferred candidate. This last is the requirement of racially polarized voting. *Gingles,* at 50–51, 106 S.Ct. at 2766–67, 92 L.Ed.2d at 46–47.

Although the *Gingles* case involved a challenge to multi-member and at-large districts, the Court recognized that these principles apply with equal force to single-member districts. Thus, the plaintiffs at bar allege that "the minority group that is sufficiently large and compact to constitute a single-member district, has been split between two or more ... single-member districts, with the effect of diluting the potential strength of the minority vote." *Gingles*, at 50 n. 16, 106 S.Ct. at 2766 n. 16, 92 L.Ed.2d at 46 n. 16.

This Court must therefore consider the three required *Gingles* elements, in conjunction with the *Zimmer* factors set forth in the Senate Report, in order to determine under "the totality of the circumstances" whether the voting strength of Nottoway County blacks has been unlawfully diluted by the current single-member districts. In other words, the Court must "make a searching practical evaluation of the 'past and present reality,'" including the present conditions and political process in the County, to determine whether the current district scheme is denying blacks "an equal opportunity to participate in the political processes and to elect candidates of their choice." *Gingles*, at 44, 106 S.Ct. at 2763, 92 L.Ed.2d at 43; S.Rep. at 28–30. The Court now turns to this analysis.

## B. *Analysis and Conclusions*

▮ Under the facts as found and summarized above, the Court concludes that the plaintiffs have satisfied each of the three elements required by *Gingles*, and that when considered together with the Senate factors, plaintiffs have proven that vote dilution exists in violation of § 2 of the Voting Rights Act.

### The Gingles Elements

First, the plaintiffs have shown that the County's black population is sufficiently large and geographically compact to constitute a majority in one or more single-member districts. As already noted, blacks account for over 39 percent of the County's population. Further, the County has sufficient concentrations of black population that can be combined without great difficulty to create two reasonably compact districts that contain effective black voting majorities. *See* Pltfs' Exh. 1. A review of the 1980 Census map showing the population blocks (Defts' Exh. 20, 20A), reveals that while the black population is spread throughout several regions of the County, blacks are nonetheless concentrated in a number of fairly small pockets which can be connected to create two election districts. In fact, the Census map shows that blacks have predominantly settled in the northwestern, central and eastern-northeastern sections of the County, while the southern, north-central and far-eastern regions of the County have relatively sparse black populations. Defts' Exh. 20A.

Moreover, as drawn the current district lines have split or "cracked" some of these concentrated black populations into different districts, with the effect of diluting the potential strength of black voters. *See Thornburg v. Gingles*, at 46 n. 11, 50 n. 16, 106 S.Ct. at 2764 n. 11, 2766 n. 16, 92 L.Ed.2d at 44 n. 11, 46 n. 16. Indeed, given the current district lines, four districts have large black percentages of 40 to 45% (thus roughly approximating the County-wide black ratio of 39%), and yet not one district contains a black majority. Such line-drawing has, in essence, created five miniature "at-large" districts which minimize and cancel out the voting power of the County's black minority. *Cf. Gingles*, at 47, 106 S.Ct. at 2765, 92 L.Ed.2d at 44 (citing cases).

Courts have long recognized that such "cracking", "fracturing" or vote dispersal is a classic method of unlawfully diluting black voting strength. *See Ketchum v. Byrne*, 740 F.2d 1398, 1408 n. 8, 1409 (7th Cir.1984), *cert. denied* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985); *Gingles v. Edmisten*, 590 F.Supp. 345, 355 (E.D.N.C.1984) (three-judge court); *Nevett v. Sides*, 571 F.2d 209, 219 (5th Cir.1978); *Robinson v. Commissioners Court*, 505 F.2d 674 (5th Cir.1974). Such "cracking" or "fracturing" occurs where (as here) a substantial black population, large enough to constitute a majority in one or more election districts, is split between several districts, thus achieving the effect of vote dilution. *Gingles*, 478 U.S. at 50–51, 106

S.Ct. at 2766–67, 92 L.Ed.2d at 46–47; *Rybicki v. Illinois State Board of Elections*, 574 F.Supp. 1082, 1109–11 (N.D.Ill.1982) (three-judge court).

Second, the plaintiffs have also established that Nottoway County's black population is "politically cohesive." The County's black community is politically active and supports a number of vital organizations, including the local chapter of the NAACP and the Civic League. And these organizations along with a number of local black churches take positions on current social and political issues of the day. There was also evidence that political campaigning takes place in the churches. Finally, a number of black candidates have run for office in recent years and, as noted above at 1431–32, the voting patterns suggest that they enjoy widespread and substantial black support.

Third, the plaintiffs have established the final critical element required under *Gingles*—that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidates. *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2767, 92 L.Ed.2d at 47. In showing this last factor, the plaintiffs have proven that the dilution of black votes through the use of the current districts has impeded the ability of blacks to elect their chosen supervisors.

As detailed *supra* at 1431–32, the record demonstrates that the County's voting patterns are racially polarized to a substantial degree. The choices of white voters appear to be usually correlated with white candidates. Whites will generally vote as a bloc and in so voting have the strength to defeat the combined black vote and any white "cross-over" vote. This is evidenced by the results in the recent County and Blackstone town council elections, as well as in the 1985 state-wide elections for lieutenant governor. There was also lay and expert testimony which concluded that voting in the County was probably racially polarized. Such electoral analysis and anecdotal evidence constitute substantial and competent evidence to show that racial bloc voting exists. *See Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1558–59 (11th Cir.1987); *League of United Latin American Citizens v. Midland Independent School District*, 648 F.Supp. 596, 601–02 (W.D.Tex.1986), *aff'd* 812 F.2d 1494 (5th Cir.1987) (Wisdom, J.).

Finally, while the record showed that some blacks have been elected to public office in the County, this is only one factor which does not alter the Court's conclusion that the County's voting is racially polarized. As the *Gingles* Court made clear, the occasional success of some black candidates in particular elections does not necessarily disprove the existence of racial bloc voting. Special circumstances may explain minority success in certain contests, in the setting of generally polarized elections. *Gingles*, 478 U.S. at 57–58, 106 S.Ct. at 2770, 92 L.Ed.2d at 51; *see also Collins v. City of Norfolk*, 816 F.2d 932, 937–38 (4th Cir.1987). This applies, for example, to the case of supervisor Jack Green, who in November of 1987 (during the pendency of this suit) became the first black ever elected to the County's board of supervisors. There the evidence suggests that Green was elected, with 39.5% of the vote, only because the two strong white candidates had split the white majority vote. And the other black successes have come in town council races, not in county-wide elections. Thus, evidence showed that Rudolph Harmon was a unique and atypical black candidate in the Burkeville town council elections, Tr. 61–72, and that race relations in Burkeville are probably better than elsewhere in the County.

The plaintiffs have therefore satisfied the necessary elements of a vote dilution claim under § 2 of the Voting Rights Act of 1965. This Court has already made findings regarding the history of discrimination, the current socio-economic conditions and political participation within Nottoway County. In light of these facts and circumstances, and under the principles set forth in the *Gingles* decision, the Court concludes that the current districting scheme for electing supervisors in Nottoway County impermissibly dilutes the voting strength of the County's black voters in violation of § 2. In summary, the Court has carefully considered the totality of the

circumstances and has found that racially polarized voting; the legacy of official discrimination in voting matters, education, housing, and employment; and the persistence of that legacy of past discrimination, along with present segregation and socio-economic conditions, have acted in concert with the single-member districting scheme to impair the ability of politically cohesive and geographically insular black voters to participate equally in the political process and to elect candidates of their choice. *See Midland Independent School District*, 648 F.Supp. at 608.

Because the plaintiffs have proven that the Nottoway County supervisor districts violate § 2, the Court must next determine the remedy that would fully and adequately cure this violation.

## C. *The Remedy*

The defendants maintain that, even if plaintiffs meet the elements of a § 2 claim, there is no acceptable remedy that can be devised to redress such a violation. Citing the plaintiffs' proposed redistricting plan, Pltfs' Exh. 1, the defendants claim that it is not possible to draw districts which contain effective black voting majorities and which are reasonably compact. The defendants argue that any such districts would be too tortuous and irregular in shape to pass muster under the governing standards.

■ The Court disagrees. The plaintiffs' proposed plan would redraw the district lines to create two districts containing majority black populations, labeled as districts 3 and 5 on the plaintiffs' Exh. 1. *See also* Defts' Exh. 6. These proposed districts are not unreasonably irregular in shape, given the population dispersal within the County. While the plan does entail one corridor from district 2 running through district 3, this is unavoidable because of the heavily white population (93.1%) of the town of Crewe, and the need to achieve majority black populations in two of the districts. Even though the districts are not symmetrical, they are nonetheless relatively compact and are in line with the configurations of electoral districts that have been approved in other cases. *See Rybicki v. State Board of Elections*, 574 F.Supp. at 1146, 1166–67 (three-

judge court); *Midland Independent School District*, 648 F.Supp. at 621.

In short, while these proposed districts are not ideally compact, they are reasonably so. The plaintiffs' plan does not rely on districts that run through a number of "tentacle-like corridors." *Compare Terrazas v. Clements*, 581 F.Supp. 1329, 1340 (N.D.Tex.1984) (three-judge court); *Latino Political Action Committee v. City of Boston*, 784 F.2d 409, 415 (1st Cir.1986). Nor are the districts' boundary lines so unreasonably irregular, "bizarre" or "uncouth" as to approach obvious gerrymandering. *Cf. Gomillion v. Lightfoot*, 364 U.S. 339, 340–41, 81 S.Ct. 125, 126–27, 5 L.Ed.2d 110 (1960); *Karcher v. Daggett*, 462 U.S. 725, 762, 103 S.Ct. 2653, 2676, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring). The plaintiffs' proposed remedial plan is therefore not objectionable on this ground.

■ In addition, the plaintiffs' proposed redistricting plan would create two districts that contain effective black voting majorities. The plan proposes a total of five-single member supervisor districts. Of these, two districts, districts 3 and 5, would have majority black population percentages of 60.37% and 63.05%, respectively. Pltfs' Exh. 2. Because blacks account for over 39% of the County's total population, it is appropriate, in order to remedy the illegal vote dilution, that the new plan contain two districts in which blacks have an effective voting majority. The Court finds that the plaintiffs' proposal achieves this. Such a super-majority remedy is necessary as a corrective measure, because blacks in the County are disadvantaged socially and economically and as a result are likely to register and turnout to vote in lower proportions than the white population.

The Court is persuaded that, in light of the previously discussed social, economic and political conditions in Nottoway County, such a remedial plan will provide a political process that is equally open to both blacks and whites and that reasonably allows the County's blacks an opportunity to elect candidates of their choice. *See Dillard v. Crenshaw County*, 649 F.Supp. 289, 298 (M.D.Ala.1986), *aff'd* 831 F.2d 246

(11th Cir.1987); *Henderson v. Board of Supervisors of Richmond County,* —— F.Supp. ——, No. 87–560–R, slip op. at 11–13 (E.D.Va. June 6, 1988).

Contrary to defendants' contention, the general 65% guideline for remedial districts is not a required minimum which the plaintiffs must meet before they can be awarded any relief under § 2 of the Voting Rights Act. Rather, the 65% standard is a flexible and practical guideline to consider in fashioning relief for a § 2 violation. As one court has described it:

> The 65% figure is a general guideline which has been used by the Department of Justice, reapportionment experts and the courts as a measure of the minority population in a district needed for minority voters to have a meaningful opportunity to elect a candidate of their choice. The 65% guideline ... takes into account the younger median population age and the lower voter registration and turnout of minority citizens.

*Rybicki v. State Board of Elections,* 547 F.Supp. at 1149 n. 4; *accord, Ketchum v. Byrne,* 740 F.2d 1398, 1415 (7th Cir.1984).

Indeed, while the 65% figure has received approval from a number of courts, it is clearly an approximate goal and not an inflexible rule. As the Supreme Court stated in *United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed. 2d 229 (1977), "it was reasonable for the Attorney General to conclude in this case that a *substantial* nonwhite population majority—in the vicinity of 65%—would be required to achieve a nonwhite majority of eligible voters." *Id.,* 430 U.S. at 164, 97 S.Ct. at 1009 (emphasis in original); *see also Ketchum v. Byrne,* 740 F.2d at 1416 ("the district court should give careful consideration to the 65% figure or some variation of it"). Thus, the 65% figure is an approximation of the type of corrective super-majority that may be needed in any particular case. As the Seventh Circuit has made clear, this standard may even have to be reconsidered and adjusted in light of "new information" and changing circumstances. *Ketchum v. Byrne,* 740 F.2d at 1416, nn. 20, 21.

Consequently, the plaintiffs' proposed plan is not unacceptable merely because its two remedial districts contain black majorities of more than 60%, but less than 65%. As already stated, this Court finds on the record that the plaintiffs' plan would create two districts containing *effective* black voting majorities. The fact that the plaintiffs are satisfied with these percentages is itself some indication of this.

While perhaps ideally the two districts would contain black population majorities of 65% or more, under the circumstances of this case such a high percentage is not practically feasible or necessary. The Court finds that the plaintiffs' proposed plan, with its black majority percentages in two districts of 60.37% and 63.05%, provides a sufficient remedy for the proven voting rights violation.

When an election system is found to be illegally dilutive, as here, the Court has the power to order into effect a new election plan to remedy the violation. The plan adopted by the Court must fully cure the illegal aspects of the current districting scheme. *Dillard v. Crenshaw County,* 831 F.2d 246, 249 (11th Cir.1987); *Henderson v. Board of Supervisors,* slip op. at 11–13 (E.D.Va. June 6, 1988) [available on WESTLAW, 1988 WL 86680]. As the Senate Report, which accompanied the 1982 amendments to the Voting Rights Act, commented:

> The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

S.Rep. at 31, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 208; *see also Ketchum v. Byrne,* 740 F.2d at 1412; *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965) ("the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future").

With these principles in mind, the Court finds under the circumstances of this case that the plaintiffs' proposed plan would fully and equitably remedy the illegal vote

dilution that results from the current districting scheme. As already noted, the plaintiffs' proposal creates two districts, out of five, that will contain effective black voting majorities of 60% or more. Further, the proposed districts are all contiguous and, as discussed above, reasonably compact. Finally, the districts would have a total population variance of less than 10%, the measure that is generally accepted for such electoral plans. The plan thus complies with the one-person, one-vote requirement of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *See Chapman v. Meier*, 420 U.S. 1, 22–23, 95 S.Ct. 751, 763–64, 42 L.Ed.2d 766 (1975); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (permitting variation of 9.9%); *Seastrunk v. Burns*, 772 F.2d 143, 150 (5th Cir.1985). For all of the foregoing reasons, the Court adopts the plaintiffs' submitted plan as the remedy to be ordered and implemented in this case. The defendants will be directed to supply the Court with a legal metes-and-bounds description of the district boundaries depicted in the plaintiffs' plan, Exh. 1.

The adoption of new election districts will provide prospective relief for the voting rights violation. In order to eliminate the present effects of the unlawful vote dilution, the Court has the power to order that a special election be held so that Nottoway County blacks can immediately have the opportunity to exercise their votes under a remedial, nondilutive plan. *See United States v. City of Cambridge, Md.*, 799 F.2d 137, 140 (4th Cir.1986); *Henderson v. Board of Supervisors*, slip op. at 19 (E.D.Va. June 6, 1988). Accordingly, in order to provide full relief as promptly as possible, the Court will order that a special election be held for the board of supervisors of Nottoway County on November 8, 1988. The election shall be conducted under the redistricting plan today adopted by the Court.

As a final matter, the Court concludes that the plaintiffs, as prevailing parties on their § 2 voting rights claim, should recover their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1973*l* (e). *See Jordan v. Allain*, 619 F.Supp. 98, 104 (N.D.Miss.1985). The parties are directed

to meet and confer in a good faith effort to agree on what amount constitutes reasonable costs and attorneys' fees. However, if the parties are genuinely unable to agree, then the plaintiffs are directed to submit their petition for attorneys' fees no later than ten (10) business days from the date of this Opinion. The petition shall include detailed attorneys' time records. No later than ten (10) days thereafter, defendants shall submit their response to the plaintiffs' petition. Upon receiving these submissions and considering the matter, the Court will enter a final order awarding costs and attorneys' fees in this case.

An appropriate order shall issue.