**Eloy ROJAS MAMANI, et al., Plaintiffs**

v.

**Jose Carlos SANCHEZ BERZAIN, and Gonzalo Daniel Sanchez de Lozada Sanchez Bustamante, Defendants.**

**Nos. 07–22459–CIV–JORDAN, 08–21063–CIV–JORDAN.**

United States District Court, S.D. Florida, Miami Division.

June 19, 2009.

Ira Jay Kurzban, Kurzban Kurzban Weinger & Tetzeli, Miami, FL, Jennifer M. Green, Beth Stephens, New York, NY, Paul L. Hoffman, Schonburn Desimone Seplow Harris & Hoffman LLP, Venice, CA, David Rudovsky, Kairys Rudovsky Messing & Feinberg LLP, Philadelphia, PA, Jeremy F. Bollinger, Michael C. Small, Akin Gump Strauss Hauer & Feld, Los Angeles, CA, Steven H. Schulman, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, Tyler Richard Giannini, International Human Rights, Clinic of Human Rights Program, Cambridge, MA, for Plaintiffs.

Jose Carlos Sanchez Berzain, pro se.

Andres Nicholas Rubinoff, Eliot Pedrosa, Mark Paul Schnapp, Greenberg Trau-

rig, Miami, FL, Alan M. Dershowitz, Jack Landman Goldsmith, III, Cambridge, MA, Ana C. Reyes, Howard W. Gutman, Williams & Connolly, Washington, DC, for Defendants.

## Order Dismissing TVPA Claims Without Prejudice

ADALBERTO JORDAN, District Judge.

In this case, the plaintiffs—all citizens of Bolivia—seek compensatory and punitive damages from Gonzalo Daniel Sanchez de Lozada Sanchez Bustamante, the former President of Bolivia, and Jose Carlos Sanchez Berzain, the former Minister of Defense of Bolivia. The plaintiffs allege that Mr. Lozada and Mr. Berzain, in September and October of 2003, directed the Bolivian military and police to carry out extra-judicial killings of Bolivian citizens who were members of Bolivia's indigenous Aymara community in the cities of Warisata and El Alto during and after clashes with protestors and demonstrators who had blocked roads and prevented travelers from going to La Paz, the capital. The plaintiffs assert claims for their relatives' deaths under the Torture Victim Protection Act, 28 U.S.C. § 1350 Note, the Alien Tort Statute, 28 U.S.C. § 1350, and state law. This order addresses the plaintiffs' claims under the TVPA, and in particular the defendants' contention under Rule 12(b)(1) that the plaintiffs have not exhausted available remedies in Bolivia, as required by the TVPA.[1]

### I. The TVPA & Exhaustion of Local Remedies

■ In relevant part, the TVPA allows a federal civil cause of action against anyone who, under authority or color of the law of any foreign nation, "subjects an individual to extrajudicial killing." 28 U.S.C. § 1350 Note, § 2(a)(2). The TVPA also contains a provision entitled "Exhaustion of Remedies," which states that a "court shall decline to hear a claim under this section [establishing a civil cause of action] if it appears that the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350 Note, § 2(b). Though not jurisdictional in the "subject-matter" sense, see, e.g., Cabello Barrueto v. Fernandez Larios, 291 F.Supp.2d 1360, 1364–65 (S.D.Fla.2003), § 2(b)—when applicable—prevents a court from reaching the merits of a TVPA claim. The defendants argue that the claims against them under the TVPA cannot be heard at this time because the Bolivian government awarded compensation to the plaintiffs for their losses in November of 2003, and because the Bolivian government, through legislation that became effective in November of 2008, has offered additional compensation to the plaintiffs.

The Eleventh Circuit has held that § 2(b) constitutes an affirmative defense, as to which the defendant bears the burden of proof. See Jean v. Dorelien, 431 F.3d 776, 781 (11th Cir.2005). The Senate Committee report on the TVPA, cited by the Eleventh Circuit in Jean, 431 F.3d at 781–82, explains that, "[o]nce the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant." S.Rep. No. 102–249, at 10, 102nd Cong. 1st Sess.1991, reprinted in 1991 WL 258662 (Leg.Hist.) (Nov. 26, 1991).

---

1. A separate order on the remaining claims will follow.

## II. Discussion

■ On a motion to dismiss under Rule 12(b)(1) a court is not limited to the four corners of the complaint, and may review and consider evidence submitted by the parties. If the evidence conflicts, the court may "act[ ] as a fact finder in resolving [a] factual dispute" concerning exhaustion of remedies. *See Bryant v. Rich*, 530 F.3d 1368, 1373–74 (11th Cir.2008) (adopting this rule for exhaustion of administrative remedies under the PRLA, 42 U.S.C. § 1997e(a)). The defendants, as they are permitted to do under Rule 12(b)(1), have submitted evidence of remedies provided and made available to the plaintiffs by the Bolivian government in 2003 and 2008. This evidence is summarized below.

■ In November of 2003, the Bolivian government passed a Humanitarian Assistance Agreement to provide compensation to the "widows and legitimate heirs" of those who were killed during the so-called "Gas War" in September and October of 2003. This Humanitarian Assistance Agreement provided, in relevant part, that beneficiaries of the deceased would receive a one-time lump sum payment of B$55,000 (Bolivianos) in "humanitarian assistance compensation," as well as an additional B$5,000 for "emergency and funeral expenses." *See, e.g.,* Corrected Amended Consolidated Complaint at ¶ 48; Humanitarian Assistance Agreement (Nov. 20, 2003) [D.E. 81, Exh. 38].[2] These payments were not insubstantial. In Bolivia, the 2003 annual per capita income (also known as gross national income using the World Bank Atlas method) was USD $900.[3] At the average exchange rate for 2003 (1 U.S. dollar = 7.6592 Bolivianos[4]) B$55,000 is equivalent to USD $7,180.90, or almost 8 times the 2003 annual average per capita income.

Several years later, in November of 2008, the Bolivian government enacted legislation entitled "Law for the Victims of the Events of February, September, and October of 2003." This legislation, known as Law No. 3955, states that its purpose is to "grant the benefit of a single payment, as well as academic assistance and public acknowledgment of the victims of February, September, and October of 2003." To this end, Law No. 3955 provides to the heirs of each deceased person a payment equal to 250 "national minimum salaries," as well as free public university educations to obtain bachelors' degrees. Law No. 3955 also states that it "does not release those individuals who have been identified as perpetrators or persons responsible before Bolivian or foreign authorities … from liability for criminal, civil, or any other nature of responsibility for the events [in question]." *See* Enactment of Law for the Victims by Bolivian House of Representatives and Transmittal to Bolivian Senate (July 9, 2008) [D.E. 94, Exh. 48]; Official Gazette of Bolivia, Enactment

**2.** All docket entry citations refer to docket entries in Case No. 07–22459.

**3.** *See* World Health Organization, Country Cooperation Strategy—Bolivia (April 2007) (available at http://www.who.int/countries/bol/en/) (last visited March 30, 2009).

**4.** *See* www.cbsnews.com/stories/2007/09/17/country-facts/main3268330.shtml (last visited March 30, 2009); www.worldpress.org/profiles2/bolivia.cfm (last visited March 30, 2009). I take judicial notice of Bolivia's per capita income and the exchange rate of the Boliviano to the U.S. dollar pursuant to Federal Rule of Evidence 201. *See, e.g., In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6, 15 n. 10 (1st Cir.2008) (taking judicial notice of exchange rates); *Exelon Generation Co., LLC v. General Atomics Tech. Corp.*, 559 F.Supp.2d 892, 903–04 (N.D.Ill.2008) (same); *Aragon–Lemus v. Barnhart*, 280 F.Supp.2d 62, 73 n. 10 (W.D.N.Y. 2003) (same); *Neal v. Coleburn*, 689 F.Supp. 1426, 1428 (E.D.Va.1988) (taking judicial notice of per capita income).

of Law No, 3955 (Nov. 6, 2008) [D.E. 108–3, Exh. 60]. According to one of Bolivia's national newspapers, the payment of 250 national minimum salaries to the heirs of each deceased person amounts to a total of B$144,375. *See* "Law for October 2003 Victims Passed," *La Razon* (July 13, 2008)[D.E. 94, Exh. 47]. Given the average exchange rate for 2008 (1 U.S. dollar = 7.253 Bolivianos[5]) this sum is equivalent to USD $19,905.56. If the 2008 annual per capita income in Bolivia was USD $1,260, as calculated by the World Bank,[6] then the total payment would be 15.79 times the annual per capita income. If the 2008 annual per capita income in Bolivia was USD $1355.10, as calculated by the United Nations,[7] then the total payment would be 14.68 times the annual per capita income.

The defendants assert that all the plaintiffs received the 2003 payments from the Bolivian government. Significantly, the plaintiffs do not deny that they received the payments, but respond that the payments were not meant to compensate them for the deaths of their relatives. The plaintiffs point to a June 17, 2008, letter from the Bolivian Ministry of Justice indicating that the payments were not determined on an individual basis for each victim's damages and did not require the plaintiffs to waive any rights they had to "seek compensation through other available means and from the persons responsible." *See* Ministry of Justice Letter (June 17, 2008) [D.E. 89–9, Exh. H]. The plaintiffs also argue that § 2(b) of the TVPA is inapplicable because they have not obtained a "judicial judgment" against the defendants in a Bolivian court, and because the payments given to them and accepted by them do not address the defendants' liability for their wrongful conduct.

It seems to me that the defendants have the better of the argument with respect to the effect of the 2003 payments. First, the payments included a lump sum for "humanitarian assistance" plus another separate sum for funeral and burial expenses, and these combined sums were about 8 times the 2003 Bolivian per capita income. It is difficult for the plaintiffs to say that the 2003 payments did not constitute compensation (albeit non-individualized compensation) for their losses. Second, although those payments may not have affected the plaintiffs' ability to seek further recovery from the defendants under Bolivian law, the letter from the Bolivian Ministry cannot alter the exhaustion of remedies requirement found in § 2(b) of the TVPA. Nor can it serve to definitively construe § 2(b), which is a provision of American law. Third, nothing in the text of § 2(b) limits an available local remedy to a common-law court judgment of the type we are accustomed to in the United States. Many countries around the world have legal systems that do not fit the American model, and these legal systems are as varied as their countries' flags. It would be insultingly parochial for a federal court in the United States to hold that a foreign country cannot figure out the best

**5.** *See* http://en.wikipedia.org/wiki/Tables_of_historical_exchange-rates_to_the_USD (last visited June 18, 2009); http s://www.cia.gov/library/publications/the-world-factbook/print/bl.html; www.greenwichmeantime.com/timezone/south-america/bolivia/currency.htm (last visited March 30, 2009).

**6.** *See* World Bank, World Development Indicators Database (rev. April 24, 2009), available at http://siteresources.worldbank.org/DATASTATISTICS/Resources/GNIPC.pdf (last visted May 22, 2009); http://unicef.org/infobycountry/stats_popup7.html (last visited May 22, 2009).

**7.** *See* http://data.un.org/CountryProfile.aspx?crName=Bolivia20 (last visited May 22, 2009).

way (judicial, administrative, legislative, etc.) to provide remedies to victims of past government wrongdoing, or for a federal court to refuse to recognize remedies that are not deemed to be "judicial" in the English/American common-law tradition. *See generally* E. Duruigbo, *Exhaustion of Local Remedies in Alien Tort Litigation: Implications for International Human Rights Protection*, 29 FORDHAM INT'L L.J. 1245, 1259 (June 2006) ("A claimant is expected to exhaust all internal legal remedies in the host country. Ordinarily, legal remedies refer to those remedies of a judicial nature, but some commentators assert persuasively that the requirement [of exhaustion] extends to those remedies that are administrative or legislative in form."). Fourth, as history has unfortunately shown, it is not necessarily the case that foreign court judgments are better than administrative or legislative compensation; even when obtained, foreign court judgments are sometimes unenforceable and ineffective. *See, e.g., Jean*, 431 F.3d at 782–83.[8]

If only the 2003 payments were at issue, I would be faced with the difficult task of figuring out what, if any, preclusive effect those payments would have on the plaintiffs' TVPA claims in this case. This task would be made all the more daunting because, if it turns out that preclusion principles apply under the TVPA, it is unclear whose preclusion rules would apply. As far as I can tell, no federal court has yet grappled with these issues, but at least one commentator has noted them. *See* W. Castro, *The New Federal Common Law of Tort Remedies for Violations of International Law*, 37 RUTGERS L.J. 635, 660 (Spring 2006) ("What happens if the victim of torture in a foreign country has prosecuted the claim overseas? May the claimant then relitigate in the United States under the TVPA? . . . . [T]he statutory language of exhaustion literally indicates that the right to relitigate will be a function of claim and perhaps issue preclusion. The TVPA's legislative history is not very helpful on this highly technical issue.").[9]

█ The 2003 payments, however, are not the only Bolivian remedies provided or made available to the plaintiffs. Law No. 3955—enacted in November of 2008—provides the plaintiffs with additional monetary compensation for the events of 2003. That total monetary compensation is, as noted above, a substantial sum in Bolivia (14–15 times the 2007 Bolivian per capita income), and is even greater if the 2003 payments are considered. Although this amount of money may not be as much as a plaintiff might be able to recover in an American court, that does not mean the remedy is so inadequate so as to excuse exhaustion. *See Corrie v. Caterpillar, Inc.*, 403 F.Supp.2d 1019, 1025–26 (W.D.Wash.2005) (holding that TVPA plaintiffs had to exhaust available remedies in Israel: "A foreign remedy is adequate even if not identical to remedies available in the United States. Courts usually find a foreign remedy adequate unless it is 'no remedy at all.'") (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)).

The plaintiffs have not tried to obtain compensation under Law No. 3955, and have not shown that such compensation is ineffective, unobtainable, unduly pro-

8. All of these conclusions apply with full force to the remedies provided by Law No. 3955, so I do not repeat them later.

9. One of the early supporters of the proposed legislation which eventually became the TVPA explained that the bill would "permit victims of foreign torture to undertake a civil action against their torturers in the United States *if they are unable to obtain redress in the country where the torture took place.*" 134 Cong. Record 28611, 28614 (Oct. 5, 1988) (remarks of Rep. Fascell) (emphasis added).

longed, inadequate, or obviously futile. *See* S. Report No. 102–249, at 10. As a result, they have not exhausted "adequate and available" remedies in Bolivia, as required by the TVPA.

Aside from the text of § 2(b), there is another reason why the plaintiffs must first seek to obtain the compensation provided by Law No. 3955. In most TVPA cases where courts have found local remedies to be ineffective or futile, the foreign government actors being sued have remained in power or returned to power, thereby rendering any judgments against them worthless. *See, e.g., Jean,* 431 F.3d at 782–83 (defendant failed to establish non-exhaustion of local remedies under the TVPA, even though plaintiff had obtained a judgment against him in Haiti, because the defendant had escaped from prison in Haiti, the judge and prosecutor in the prior case had been attacked, and others threatened the rule of law in the country); *Abiola v. Abubakar,* 435 F.Supp.2d 830, 836–37 (N.D.Ill.2006) (pursuit of available remedies against defendant—a former member of the military regime which ruled Nigeria—was futile under the TVPA because Nigerian law required the plaintiffs to sue defendant within 3 months of accrual of cause of action, and during that period of time defendant's regime was "still in power" and "barred Nigerian courts from questioning acts undertaken by the . . . regime"). Here, in contrast, a new government—headed by Evo Morales—has been in power since December of 2005, well before the plaintiffs filed their lawsuits in the United States. The current Bolivian government believes that the defendants committed criminal wrongdoing in 2003, as it has issued pre-indictments against them and sought their extradition from the United States. *See* Corrected Amended Consolidated Complaint at ¶ 75–77; "Bolivia Seeks to Extradite Former President Sanchez de Lozada, Who Fled to the United States," *Agency France Press*

(Oct. 18, 2008) [D.E. 106–3, Exh. 58]. Application of § 2(b) in this case would "encourage the development of meaningful remedies" not only in Bolivia, but in other countries as well. *See* H.R. Rep. 102–367, at 5, 102nd Cong. 1st Sess.1991, 1992 U.S.C.C.A.N. 84, 88, *reprinted in* 1991 WL 255964 (Leg.Hist.) (Nov. 25, 1991). *See also* E. Duruigbo, *Exhaustion of Local Remedies,* 29 FORDHAM INT'L L.J. at 1284 ("[W]e should not lose sight of the fact that the requirement of exhaustion of local remedies provides a window of opportunity to beam the search light on the existing state of affairs in developing countries and let such discovery inform and form the basis for meaningful social, economic, political, and legal reforms in those countries.").

## III. CONCLUSION

When he signed the TVPA into law in 1992, President George H.W. Bush recognized the danger that federal courts could "become embroiled in difficult and sensitive disputes in other countries, and possibly ill-founded or politically motivated suits, which have nothing to do with the United States and which offer little prospect of successful recovery." He expressed hope that courts in the United States would "avoid these dangers by sound construction of the [TVPA] and the wise application of relevant legal procedures and principles." *See* President George H.W. Bush's Signing Statement as to the TVPA, 29 Weekly Compilation of Presidential Documents 465, 1992 U.S.C.C.A.N. 91 (March 16, 1992). Applying § 2(b)'s exhaustion requirement here ensures that a federal court will not have to address the TVPA claims until the plaintiffs have tried to obtain the remedies made available to them by the Bolivian government.

The plaintiffs' TVPA claims are DIS-MISSED WITHOUT PREJUDICE. The plaintiffs

are required to seek compensation in Bolivia under Law No. 3955 before they can assert their TVPA claims. I express no view on what preclusive effect, if any, such compensation-when combined with the 2003 payments-may have on the plaintiffs' TVPA claims.

DONE AND ORDERED.